690 A.2d 169

Dominique D. SKIPWORTH, a minor, by her legal guardian, Pandora WILLIAMS, and her mother and co-legal guardian, Ernestine Richardson, Appellants,

v.

LEAD INDUSTRIES ASSOCIATION, INC., NL Industries, Inc., Atlantic Richfield Company, Sherwin Williams Company, SCM Corporation, The Glidden Company, E.I. DuPont De Nemours & Co., Tin Lion Enterprises, Inc., Joseph F. Fillion and Frances Fillion, George Keehfus, Jr., City of Philadelphia, Department of Health.

Supreme Court of Pennsylvania.

Argued Oct. 16, 1996.

Decided Feb. 19, 1997.

226

Lawrence R. Cohan, Philadelphia, Colleen M. Hickey, Collegeville, for appellants.

Thomas M. Kittredge, James D. Pagliaro, Philadelphia, for Lead Industries Assoc., Inc.

Timothy S. Hardy, Kirsten K. Robbins, Washington, DC, Ellen Rogoff, Philadelphia, for NL Industries, Inc.

Christopher N. Santoro, Philadelphia, for Joseph and Francis Fillion.

William H. Kinkead, III, Blue Bell, for George W. Keehfus, Jr.

John E. Iole, Charles H. Moellenberg, Jr., Pittsburgh, John P. Penders, Philadelphia, Paul M. Pohl, Pittsburgh, for Sherwin Williams.

Michael J. Sweeney, Pittsburgh, for E.I. Du Pont de Nemours & Co.

James R. Miller, Pittsburgh, for PPG/DuPont/Pratt & Lambert.

Mary E. Kohart, Julia Ann Matheson, Philadelphia, for SCM Corp. & The Glidden Co.

Robert C. Heim, Mary A. McLaughlin, Philadelphia, for Atlantic Richfield Company.

Edwin L. Kleet, for Amicus Curiae Pa. Chamber of Business and Industry.

Darrell M. Zaslow, Philadelphia, for Amicus Curiae Homeowner's Assoc. of Phila.

K. W. James Rochow, Harrisburg, for Amicus Curiae Alliance to End Childhood Lead Poisoning.

Denise Baker, Philadelphia, for Amicus Curiae Phila. Housing Authority.

Martin Greitzer, Philadelphia, for Amicus - Pa. Trial Lawyers Assoc.

Arthur H. Bryant, Philadelphia, for Amicus Curiae Trial Lawyers for Public Justice.

George D. Gould, Philadelphia, for Amicus Curiae Tenants' Action Group Community Legal Services.

Edward W. Madeira, Jr., James M. Beck, Philadelphia, Hugh F. Young, Jr., for Amicus Curiae Product Liability Advisory Council, Inc.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO and NEWMAN, JJ.

## OPINION OF THE COURT

CAPPY, Justice.

This is an appeal by allowance from the order of the Superior Court, affirming the entry of summary judgment by the Court of Common Pleas of Philadelphia County. For the reasons that follow, we now affirm.

Dominique Skipworth ("Skipworth") was born on September 18, 1988. Between September 10, 1990 and May 8, 1991, she was hospitalized for lead poisoning on three separate occasions. She also received outpatient therapy for lead poisoning in August 1991, and again in June 1992. During this time, she resided at only one home, located at 2840 West Stiles Street in Philadelphia. This residence, which had been rented by Skipworth's guardian, Pandora Williams ("Williams"), was estimated to have been built circa 1870. Testing of Skipworth's

residence revealed the presence of lead-based paint at various locations throughout the home.

On March 17, 1992, Skipworth filed an action through her legal guardian, Williams, and her co-legal guardian and mother, Ernestine Richardson (collectively referred to as "Appellants") against several manufacturers of lead pigment ("the pigment manufacturers") and their alleged successors as well as a trade association, Lead Industries Association, Inc. ("LIA").[1] Appellants alleged that Skipworth suffered physical and neuropsychological injuries as a result of lead poisoning from the lead paint in her home. Appellants stipulated that they could not identify the manufacturer of the lead pigment which Skipworth ingested, and admitted that they could not identify when such pigment was made, sold, or applied to her home. Appellants, however, alleged that they had identified and joined in this action substantially all of the manufacturers of lead pigment used in residential house paint from 1870 until production of lead pigment ceased in 1977. Appellants thus proceeded against the pigment manufacturers and LIA (collectively referred to as "Appellees") by invoking theories of collective liability, namely market share liability, alternate liability, conspiracy, and concert of action.

Appellees filed a motion for summary judgment. The trial court granted Appellees' motion for summary judgment as to all counts of Appellants' complaint.

The Superior Court affirmed. In discussing Appellants' contention that market share liability is a viable theory of recovery in Pennsylvania, the Superior Court noted that neither this court nor the legislature had adopted market share liability as a theory of recovery in products liability actions. 445 Pa.Super. 610, 617, 665 A.2d 1288, 1292. Indicating that such an extensive policy shift as adopting market share liability was not for an intermediate appellate court to make, the Superior Court declined to award Appellants relief on this issue. The Superior Court then determined that Appellees

1. Appellants also sued the owner and manager of the property within which Skipworth resides as well as the City of Philadelphia's Department of Health. These other defendants are not parties in this appeal.

were also entitled to judgment as a matter of law as to Appellants' remaining claims of alternate liability, conspiracy and concert of action. Appellants subsequently filed a petition for allowance of appeal from this determination, and we granted allocatur. We now affirm.

In reviewing whether a trial court's award of summary judgment was appropriate in a case, we view the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. *Pennsylvania State University v. County of Centre*, 532 Pa. 142, 144–145, 615 A.2d 303, 304 (1992). Only where there is no genuine issue as to any material fact and it is clear that the moving party is entitled to a judgment as a matter of law will summary judgment be entered. Pa.R.C.P. No. 1035. As all of the issues in this case present questions of law, our scope of review is plenary. *See Phillips v. A–Best Products Co.*, 542 Pa. 124, 130, 665 A.2d 1167, 1170 (1995).

The first question presented in this appeal is whether this court should adopt the market share liability theory in the context of lead poisoning cases.[2] The market share liability theory[3] provides an exception to the general rule that a plaintiff must establish that the defendant proximately caused

**2.** We note that one of the Appellees, the Sherwin–Williams Company ("Sherwin–Williams"), has asserted that we need not address the market share liability issue because the materials upon which Appellants rely for their market share liability argument are inadmissible and therefore their claim cannot survive summary judgment on this basis alone. Sherwin–Williams asserts that several reports filed by Appellants as affidavits are inadmissible because these reports were unsworn. *See* Pa.R.C.P. No. 76, "affidavit". The exhibits to which Sherwin–Williams points are the reports and letters of Barach & Company, Dr. Henretig, Dr. Golinkoff, Dr. Smith, and Environmental Protection Inspection, Inc.

After exhaustive review of the record, however, we have found no indication that Sherwin–Williams raised this issue prior to raising it on appeal to this court. Therefore, we conclude that this issue has been waived. *See* Pa.R.A.P. 302(a).

**3.** It would appear that this theory emanated from an article written by a law student. *See* Comment, *DES and a Proposed Theory of Enterprise Liability*, 46 Fordham L.Rev. 963 (1978).

his or her injury. A sharply divided California Supreme Court was the first court to adopt this theory of liability. *See Sindell v. Abbott Laboratories,* 26 Cal.3d 588, 607 P.2d 924, 163 Cal.Rptr. 132 (1980). The *Sindell* case involved a plaintiff who developed cancer as a result of her mother's ingestion during pregnancy of diethylstilbestrol ("DES"), a drug with an identical formula manufactured by several different companies. Because of the inability to trace the source of the DES due to its fungible nature and the long time lapse between its sale and the development of health problems, the plaintiff was unable to identify, through no fault of her own, the manufacturer of the DES ingested by her mother.

The *Sindell* court concluded that the plaintiff need not identify which particular manufacturer made the DES ingested by her mother, and held that the manufacturers of the product identical to the one which harmed plaintiff were liable in shares proportional to their share of the market at the time plaintiff's mother ingested the drug, regardless of actual causation. *Id.* at 612, 607 P.2d at 937, 163 Cal.Rptr. at 145. The *Sindell* court stated that market share liability is appropriate where the following factors are present: all the named defendants are potential tortfeasors; the allegedly harmful products are identical and share the same defective qualities (or were "fungible"); the plaintiff is unable to identify which defendant caused her injury through no fault of her own; and, substantially all of the manufacturers which created the defective products during the relevant time are named as defendants. *Id.* at 611–612, 607 P.2d at 936–937, 163 Cal.Rptr. at 144–145. The rationale for adopting this theory was that "each manufacturer's liability would approximate its responsibility for the injuries caused by its own products." *Id.* at 612, 607 P.2d at 937, 163 Cal.Rptr. at 145.

■ Pennsylvania, on the other hand, follows the general rule that a plaintiff, in order to recover, must establish that a particular defendant's negligence was the proximate cause of her injuries. *See Cuthbert v. City of Philadelphia,* 417 Pa. 610, 614, 209 A.2d 261, 263 (1965) (proximate causation is the "vitally important link" necessary to impose tort liability).

Adoption of the market share liability theory would result in a significant departure from this rule.[4] Although we realize that there may arise a situation which would compel us to depart from our time-tested general rule, such a situation is not presented by the matter *sub judice*. Application of market share liability to lead paint cases such as this one would lead to a distortion of liability which would be so gross as to make determinations of culpability arbitrary and unfair.

The extent to which liability would be contorted in a lead pigment case were market share liability to be applied is brought into sharp focus when the facts presented by this case are compared with the situation presented by a typical DES case, which is the type of case for which this theory was created. Such a comparison has revealed to us two major factors which compel us to conclude that adoption of market share liability in the context of a lead pigment case would unacceptably distort liability. First, *the relevant time period in question is far more extensive than the relevant time period in a DES case.* In this case, Appellants cannot identify any particular application, or applications, of lead paint which have caused Skipworth's health problems. Thus, they "pinpoint" a more than one hundred year period from the date the house was built until the lead paint ceased being sold for residential purposes as the relevant time period. In contrast, the relevant time period in a DES case is necessarily limited to the nine months that the patient ingesting the product was pregnant.

The difficulty in applying market share liability where such an expansive *relevant time period as one hundred years is at issue* is that entities who could not have been the producers of the lead paint which injured Skipworth would almost assuredly be held liable. Over the one hundred year period at issue, several of the pigment manufacturers entered and left the lead paint market. R.R. at 336a–349a; 578a–579a. Thus, applica-

4. Even courts from other jurisdictions which have adopted this theory have recognized that it is a significant modification of or deviation from the traditional theories of causation. *Sindell,* 26 Cal.3d at 610, 607 P.2d at 936, 163 Cal.Rptr. at 144; *Martin v. Abbott Laboratories,* 102 Wash.2d 581, 602, 689 P.2d 368, 381 (1984).

tion of the market share theory to this situation would virtually ensure that certain pigment manufacturers would be held liable where they could not possibly have been a potential tortfeasor; therefore, the first prong of the *Sindell* test would not be met.

The second factor which persuades us that adoption of market share liability here would be inappropriate is that lead paint, as opposed to DES, is not a fungible product. All DES used for treatment of pregnant women was manufactured according to an identical formula and presented an identical risk of harm. *Sindell,* 26 Cal.3d at 611, 607 P.2d at 936, 163 Cal.Rptr. at 144. In contrast, it is undisputed that lead pigments had different chemical formulations, contained different amounts of lead, and differed in potential toxicity. R.R. at 313a–314a; 332a–333a.

Appellants contend that "whether all of the lead pigment [the pigment manufacturers] manufactured was exactly the same, in every respect, [is] irrelevant...." We do not see this problem being so easily dismissed. Uncontested evidence shows that differing formulae of lead paint result in differing levels of bioavailability [5] of the lead. R.R. at 313a–314a. Because of differences in bioavailability, a child who ingests dust or chips of lead paint containing equal amounts of lead "derived from two lead paints will *not* generally develop equal elevation in internal lead level from the two paints. Rather, more highly bioavailable lead has a greater impact than lead in less bioavailable form." R.R. at 314a–315a (emphasis in the original). Thus, differing formulae of lead paint has a direct bearing on how much damage a lead paint manufacturer's product would cause.

Contrary to Appellants' bald assertion that this is an irrelevant consideration, it is actually fatal to their claim that application of market share liability to these defendants would

5. The term "bioavailability" refers to "the extent to which the lead is in a form which is easily internalized by the body, *i.e.,* the extent to which it is in a form which can be physiologically transported through the lungs, gastrointestinal tract, skin, etc. and absorbed into the bloodstream...." R.R. at 313a–314a.

be appropriate. Market share liability is grounded on the premise that it ensures that "each manufacturer's liability would approximate its responsibility for the injuries caused by its own products." *Sindell,* 26 Cal.3d at 612, 607 P.2d at 937, 163 Cal.Rptr. at 145. Yet, in this case, apportioning liability based upon a manufacturer defendant's share of the market (even if it were possible to obtain an accurate statistic considering the lengthy relevant time period at question) would not serve to approximate that defendant's responsibility for injuries caused by its lead paint. For example, a manufacturer whose lead product had a lower bioavailability than average would have caused less damage than its market share would indicate. Thus, application of market share liability to such a manufacturer would impose on it disproportionately high share of the damages awarded.

As we find that application of market share liability to lead paint cases would grotesquely distort liability, we decline to apply it in this case.

The next question concerns whether the trial court correctly entered summary judgment in favor of Appellees on Appellants' alternative liability count. Section 433B(3) of the Restatement (Second) of Torts, which sets forth the alternative liability theory, states that:

> [w]here the conduct of two or more actors is tortious, and it is proved that harm has been caused to the plaintiff only by one of them, but there is uncertainty as to which one has caused it, the burden is upon each such actor to prove that he has not caused the harm.

The theory of alternative liability dictates that tortfeasors who act in concert will be held jointly and severally liable for the plaintiff's injury unless the tortfeasors are able to prove that they have not caused the harm. The leading case on this doctrine was *Summers v. Tice,* 33 Cal.2d 80, 199 P.2d 1 (1948). In *Summers,* the plaintiff was struck by pellets shot from one of the two defendants' guns. Plaintiff could not establish which of the defendants had actually injured him, but could prove that both had acted negligently. The California

Supreme Court held that where the evidence showed that the two defendants negligently shot at about the same time and that the pellets from one of their guns struck the plaintiff, the burden of proving which defendants' shot struck the plaintiff shifted to the defendants; the court further held that in the absence of further evidence, judgment could be properly entered against both defendants. *Id.* at 86–88, 199 P.2d at 4–5.

We adopted this theory of liability in *Snoparsky v. Baer*, 439 Pa. 140, 266 A.2d 707 (1970). In *Snoparsky*, several stones were thrown at plaintiff by the defendants. Only one stone, however, struck and injured the plaintiff. The plaintiff in *Snoparsky* was allowed to proceed under alternative liability because the tortious conduct of defendant was simultaneous and identical, and the plaintiff joined all potential tortfeasors as defendants. *See id.*; *see also Sommers v. Hessler*, 227 Pa.Super. 41, 323 A.2d 17 (1974).

■ The trial court correctly concluded that alternate liability theory is inapplicable to the matter *sub judice*. First, Appellees did not act simultaneously in producing the lead paint. Over the one hundred year period at issue, several of the named Appellees entered and left the lead paint market. R.R. at 336a–349a; 578a579a. Second, it is uncontroverted that Appellants have failed to join all entities which manufactured lead paint over the one hundred year period, R.R. 336a–349a, and therefore have failed to join all potential tortfeasors.

■ The next issue is whether the trial court correctly entered summary judgment in favor of Appellees on Appellants' civil conspiracy claim. In order to state a cause of action for civil conspiracy, a plaintiff must show "that two or more persons combined or agreed with intent to do an unlawful act or to do an otherwise lawful act by unlawful means. Proof of malice, i.e., an intent to injure, is essential in proof of a conspiracy." *Thompson Coal Co. v. Pike Coal Co.*, 488 Pa. 198, 211, 412 A.2d 466, 472 (1979) (citations omitted). Thus, in order to withstand summary judgment on this claim, Appellants must have produced evidence which would establish that

Appellees acted in concert to commit an unlawful act or do a lawful act by unlawful means, and that they acted with malice.

Appellants have failed to introduce evidence which would support their cause of action for civil conspiracy. First, Appellants have failed to introduce evidence that Appellees were acting in concert. Second, Appellants have also failed to demonstrate malice on the part of Appellees.

The final question for this court to review is whether the trial court properly entered summary judgment in favor of Appellees on Appellants' concert of action claim. This theory provides in pertinent part that "[f]or harm resulting to a third person from the tortious conduct of another, one is subject to liability if he (a) does a tortious act in concert with the other or pursuant to a common design with him. . . ." Restatement (Second) of Torts, § 876.

The concert of action theory has not yet been discussed by this court, but has been addressed by our Superior Court. *See Burnside v. Abbott Laboratories,* 351 Pa.Super. 264, 505 A.2d 973, (1985); *Kline v. Ball,* 306 Pa.Super. 284, 452 A.2d 727 (1982). In *Burnside* and *Kline,* the Superior Court held that a claim of concerted action cannot be established if the plaintiff is unable to identify the wrongdoer or the person who acted in concert with the wrongdoer. *Burnside,* 351 Pa.Super. at 284, 505 A.2d at 984; *Kline,* 306 Pa.Super. at 287, 452 A.2d at 729. We find that these interpretations of the concert of action theory are eminently reasonable and hereby expressly adopt them.

We find that Appellants failed to establish that they had a cause of action for concert of action as they are unable to identify the manufacturer of any of the lead pigment found at Skipworth's residence that was ingested by her and allegedly caused her injuries. As they are unable to identify any one of the lead pigment manufacturers as the wrongdoer, we therefore hold that the trial court correctly entered summary judgment on the concert of action claim.

For the reasons set forth herein, the order of the Superior Court is affirmed.