Hope D. DeSANTIS, Executrix of the
Estate of Angela L. DeSantis,
Deceased, Appellants

v.

FRICK COMPANY, now by merger,
York International Corporation and
the Pennsylvania Defense Institute,
Appellees.

Superior Court of Pennsylvania.

Argued June 10, 1999.

Filed Dec. 23, 1999.

Reargument Denied Feb. 24, 2000.

Tim Riley, Erie, James A. Henderson, Ithaca, NY, and Aaron D. Twerski, Brooklyn, NY, for appellant.

James R. Fryling, Erie, for Frick, appellee.

Before JOHNSON, LALLY–GREEN, and HESTER, JJ.

LALLY–GREEN, J.:

¶ 1 Appellant, Hope DeSantis, appeals an order of the Court of Common Pleas of Erie County granting summary judgment to Appellee, Frick Company, in this products liability action. We affirm.

¶ 2 The trial court made the following findings of fact:

In 1964, the Frick Company manufactured and sold an industrial freezer to Rich Products Corporation. It also installed the unit in the company's manu-

facturing plant to such an extent that the parties agree it constituted an "improvement to real property" within the meaning of 42 Pa.C.S. § 5536, generally referred to as the "Statute of Repose".

Angela DeSantis, [a] Rich Products employee, was killed as a result of inhaling anhydrous ammonia while working in the plant in 1993. The ammonia was released into the workplace because a valve on the freezer ruptured from "hydraulic shock," a condition which sometimes occurs when liquid ammonia used as a refrigerant condenses and accumulates in a freezer coil during manual defrosting. Frick stopped manufacturing this kind of freezer system in the late 1960's. No valve on the system installed at Rich had previously failed in this manner.

In the mid to late 1980's, manufacturers of industrial freezers of the type at issue in this case began installing a "liquid drainer," which prevented condensed liquid and ammonia from accumulating and reduced the chance of hydraulic shock. In addition, in the early 1990's, a device known as a "scrubber" was developed which had the effect of dissipating inordinate pressure which would build up behind the valves as a result of the accumulation of liquid ammonia in freezer coils. Information concerning the use of these devices was disseminated throughout the freezer industry and Frick would have been aware of it through trade publications or other means. Frick did not advise Rich or other freezer customers of their utilization. Had one or both of these devices been installed on Rich's freezer system, the likelihood that the valve in question would have ruptured would have been significantly diminished.

Trial Court Opinion, 10/27/98, at 1–3. (Footnote omitted).

¶ 3 Appellant, the mother of Angela De-Santis, filed a complaint on June 6, 1997, after the death of her daughter on May 9, 1996. The complaint alleged wrongful death and survival actions. Counts I and II were based on strict products liability under Section 402A of the RESTATEMENT (SECOND) OF TORTS ("SECTION 402A"). Counts III and IV alleged negligence in design and manufacture. Counts V and VI sounded in strict products liability as to Frick's breach of its post-sale duty to warn.

¶ 4 On November 5, 1997, Frick filed a motion for summary judgment alleging Appellant's cause of action for wrongful death was barred by the statute of limitations and that the remaining survival claims were barred by the statute of repose. At argument on the motion for summary judgment, Appellant conceded that Counts I, II, III, and IV, were barred by the statute of repose but argued that Counts V and VI, the post-sale duty to warn claims, were not so barred. N.T., 8/26/98, at 3.

¶ 5 The trial court granted Frick's summary judgment motion, concluding that Appellant's cause of action for post-sale duty to warn was barred because Pennsylvania law does not recognize a cause of action for a post-sale duty to warn. This appeal followed.

¶ 6 Appellant raises two issues on appeal:

1) Whether the trial court erred in granting summary judgment on the basis that Pennsylvania law does not recognize a manufacturer's post-sale duty to warn of safety hazards inherent in the continued use of the product and technological improvements which minimize such hazards?

2) Assuming Pennsylvania law imposes the post-sale duty to warn alleged by Appellant, whether Pennsylvania's statute of repose applies to and bars her claim?

Appellant's Brief at 1.

¶ 7 This Court's review of a trial court's granting of summary judgment is well settled:

[W]hen reviewing the propriety of a trial court's order granting summary judgment, we must view the record in the light most favorable to the non-moving party and determine whether the moving party has established that there exists no genuine issue of material fact and that it is therefore entitled to judgment as a matter of law. *Skipworth v. Lead Industries Assoc.*, 547 Pa. 224, 230, 690 A.2d 169, 171 (1997). The non-moving party is entitled to all reasonable inferences. Any doubts as to the existence of a factual dispute must be resolved in the non-moving party's favor and summary judgment is appropriate only in the clearest of cases. *Kingston Coal Co. v. Felton Mining Co., Inc.*, 456 Pa.Super. 270, 277, 690 A.2d 284, 287 (Pa.Super.1997).

*Roman Mosaic & Tile Co. v. Aetna Casualty & Surety Co.*, 704 A.2d 665, 668 (Pa.Super.1997). Summary judgment is appropriate:

when the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits demonstrate that there exists no genuine issue of material fact. The moving party has the burden of proving the non-existence of any genuine issue of fact. The non-moving party must demonstrate that there is a genuine issue for trial and may not rest on averments in its pleadings.... Summary judgment may only be granted in cases where it is clear and free from doubt that the moving party is entitled to judgment as a matter of law.

*Merriweather v. Philadelphia Newspapers, Inc.*, 453 Pa.Super. 464, 469–72, 684 A.2d 137, 140 (1996) (citations omitted).

■ ¶ 8 Appellant first argues that Pennsylvania should adopt Section 10 of the RESTATEMENT (THIRD) OF TORTS ("Section 10"),[1] and thereby recognize that a manufacturer has an independent post-sale duty to warn about risks and risk-avoidance measures that occur after the time of the original sale irrespective of whether the product was defective at the time of the original sale. Specifically, Appellant alleges that the 1964 refrigeration system became defective at some point between 1985 and 1993 when Frick failed to advise Rich Products that use of liquid float drainers or "snubbers" were being recommended.

Section 10 provides:

Liability of Commercial Product Seller or Distributor for Harm Caused by Post–Sale Failure to Warn

(a) One engaged in the business of selling or otherwise distributing products is subject to liability for harm to persons or property caused by the seller's failure to provide a warning after the time of sale or distribution of a product if a reasonable person in the seller's position would provide such a warning.

(b) A reasonable person in the seller's position would provide a warning after the time of sale if:

  (1) the seller knows or reasonably should know that the product poses a substantial risk of harm to persons or property; and

  (2) those to whom a warning might be provided can be identified and can reasonably be assumed to be unaware of the risk of harm; and

  (3) a warning can be effectively communicated to and acted on by those to whom a warning might be provided; and

  (4) the risk of harm is sufficiently great to justify the burden of providing a warning.[2]

---

**1.** The RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY, was adopted by the American Law Institute in 1997. *See* Appellant's Brief at 20.

**2.** The Comments to Section 10 state:

a. Rationale. Judicial recognition of the seller's duty to warn of a product-related risk after the time of sale, whether or not the product is defective at the time of original sale within the meaning of other Sections of this Restatement, is relatively new. None-

theless, a growing body of decisional and statutory law imposes such a duty. Courts recognize that warnings about risks discovered after sale are sometimes necessary to prevent significant harm to persons and property. Nevertheless, an unbounded post-sale duty to warn would impose unacceptable burdens on product sellers. The costs of identifying and communicating with product users years after sale are often daunting. Furthermore, as product designs are developed and improved over time, many risks are reduced or avoided by subsequent design changes. If every post-sale improvement in a product design were to give rise to a duty to warn users of the risks of continuing to use the existing design, the burden on product sellers would be unacceptably great.

As with all rules that raise the question whether a duty exists, courts must make the threshold decisions that, in particular cases, triers of fact could reasonably find that product sellers can practically and effectively discharge such an obligation and that the risks of harm are sufficiently great to justify what is typically a substantial post-sale undertaking. In deciding whether a claim based on breach of a post-sale duty to warn should reach the trier of fact, the court must determine whether the requirements in Subsection (b)(1) through (4) are supported by proof. The legal standard is whether a reasonable person would provide a post-sale warning. In light of the serious potential for overburdening sellers in this regard, the court should carefully examine the circumstances for and against imposing a duty to provide a post-sale warning in a particular case.

b. When a reasonable person in the seller's position would provide a warning. The standard governing the liability of the seller is objective: whether a reasonable person in the seller's position would provide a warning. This is the standard traditionally applied in determining negligence. See Restatement, Second, Torts § 283, Comment c. In applying the reasonableness standard to members of the chain of distribution it is possible that one party's conduct may be reasonable and another's unreasonable. For example, a manufacturer may discover information under circumstances satisfying Subsection (b)(1) through (4) and thus be required to provide a post-sale warning. In contrast, a retailer is generally not in a position to know about the risk discovered by the manufacturer after sale and thus is not subject to liability because it neither knows nor should know of the risk. Once the retailer is made aware of the risk, however, whether the retailer is subject to liability for failing to issue a post-sale warning

depends on whether a reasonable person in the retailer's position would warn under the criteria set forth in Subsection (b)(1) through (4).

c. Requirement that seller or other distributor knows or should know of the product-related risk. A duty to warn after the time of sale cannot arise unless the product seller or other distributor knows or in the exercise of reasonable care should know of the product-related risk that causes plaintiff's harm. The seller may have known or should have known of the risk at the time of sale, in which case failure to warn will cause the product to be defective under § 2(c). But even if the product is not defective at the time of sale because no reasonable seller would have known of the risk under § 2(c), knowledge of the risk may come after sale and may give rise to a duty to warn at that time.

As a practical matter, most post-sale duties to warn arise when new information is brought to the attention of the seller, after the time of sale, concerning risks accompanying the product's use or consumption. When risks are not actually brought to the attention of sellers, the burden of constantly monitoring product performance in the field is usually too burdensome to support a post-sale duty to warn. However, when reasonable grounds exist for the seller to suspect that a hitherto unknown risk exists, especially when the risk involved is great, the duty of reasonable care may require investigation. With regard to one class of products, prescription drugs and devices, courts traditionally impose a continuing duty of reasonable care to test and monitor after sale to discover product-related risks.

d. Requirement that the risk of harm be substantial. For a post-sale duty to arise under this Section, the risk of harm must be at least as great as the level of risk that would require a warning under § 2(c). Because post-sale warnings are invariably costly to provide, and post-sale increases in knowledge of risks are to some extent inevitable, no duty arises after the time of sale to issue warnings regarding product-related accidents that occur infrequently and are not likely to cause substantial harm. If post-sale acquisition of knowledge of adverse outcomes that are both infrequent and insubstantial were to trigger a post-sale duty to warn, sellers would face costly and potentially crushing burdens.

e. Requirement that those to whom a warning might be provided be identifiable. The problem of identifying those to whom product warnings might be provided is especially relevant in the post-sale context. When products are originally sold or distributed,

¶ 9 Comment a to Section 10 states that the seller's duty to warn of a product-related risk after the time of sale applies "whether or not the product is defective at the time of original sale." Section 10 premises a post-sale duty upon a finding that each and every one of the four enumerated factors in Section 10(b) is demonstrated. *See Crowston v. Goodyear Tire & Rubber Co.*, 521 N.W.2d 401, 409 (N.D. 1994).

¶ 10 A manufacturer's post-sale duty to warn is derived from the doctrine of strict products liability pursuant to Section 402A. *Walton v. Avco Corp.*, 530 Pa. 568, 575–76, 610 A.2d 454, 458 (1992). Section 402A

most often the seller accompanies the product, together with its packaging, with whatever warnings are appropriate. When knowledge of product-related risk is available to the seller only after sale, it may be difficult for the seller to determine who, in the general population of product users and consumers, is in a position to respond to warnings effectively. In some instances, customer records may identify the population to whom warnings should be provided. Individual names and addresses are not necessarily required. Records may indicate classes of product users, or geographically limited markets. But when no such records are available, the seller's inability to identify those for whom warnings would be useful may properly prevent a post-sale duty to warn from arising. See Comment g.

f. The reasonableness of assuming that those to whom a warning might be provided are unaware of the risk. To justify the cost of providing a post-sale warning, it must reasonably appear that those to whom a warning might be provided are unaware of the risk. See § 2, Comment j. Similarly, even if knowledge of the risk reasonably becomes available to the seller only after the original sale, if users and consumers are at that time generally aware of the risk a post-sale warning is not required.

g. The seller's ability to communicate the warning effectively to those who are in a position to act to prevent harm. For a post-sale duty to warn to arise, the seller must reasonably be able to communicate the warning to those identified as appropriate recipients. When original customer sales records indicate which individuals are probably using and consuming the product in question, direct communication of a warning may be feasible. When direct communication is not feasible, it may be necessary to utilize the public media to disseminate information regarding risks of substantial harm. As the group to whom warnings might be provided increases in size, costs of communicating warnings may increase and their effectiveness may decrease.

h. Requirement that those to whom a post-sale warning might be provided be able to act effectively to reduce the risk. To justify the potentially high cost of providing a post-sale warning, those to whom such warnings are provided must be in a position to reduce or prevent product-caused harm. Such recipients of warnings need not be original purchasers of the product, so long as they are able to reduce risk effectively.

i. Requirement that the risk of harm be sufficiently great to justify providing a post-sale warning. Compared with the costs of providing warnings attendant upon the original sale of a product, the costs of providing post-sale warnings are typically greater. In the post-sale context, identifying those who should receive a warning and communicating the warning to them can require large expenditures. Courts recognize these burdens and hold that a post-sale warning is required only when the risk of harm is sufficiently great to justify undertaking a post-sale warning program. Subsection (b)(4) requires that, even for a substantial risk, a seller owes a duty to warn after the time of sale only if the risk of harm is sufficiently great to justify the cost of providing a post-sale warning. The test defining unreasonable conduct is that which governs negligence generally. See Restatement, Second, Torts § 291.

j. Distinguishing post-sale failure to warn from defects existing at the time of sale. When a product is defective at the time of sale liability can be established without reference to a post-sale duty to warn. A seller who discovers after sale that its product was defective at the time of sale within the meaning of this Restatement cannot generally absolve itself of liability by issuing a post-sale warning. As long as the original defect is causally related to the harm suffered by the plaintiff, a prima facie case under this Restatement can be established notwithstanding reasonable post-sale efforts to warn. Of course, even when a product is defective at the time of sale a seller may have an independent obligation to issue a post-sale warning based on the rule stated in this Section. Thus, a plaintiff may seek recovery based on both a time-of-sale defect and a post-sale failure to warn.

(Illustrations omitted).

imposes strict liability on the seller of any product "in a defective condition unreasonably dangerous to the consumer." [3]

¶ 11 Our Supreme Court adopted Section 402A and the doctrine of strict products liability as the law of Pennsylvania three decades ago. *Webb v. Zern*, 422 Pa. 424, 220 A.2d 853 (1966). The doctrine was addressed in *Berkebile v. Brantly Helicopter Corp.*, 462 Pa. 83, 337 A.2d 893 (1975) and, more recently, in *Walton v. Avco Corp.*, 530 Pa. 568, 575–76, 610 A.2d 454, 458 (1992).[4]

¶ 12 In *Berkebile*, the Supreme Court addressed the strict liability concept under Pennsylvania law with respect to warnings and instructions. There, the estate of Cloyd Berkebile brought a wrongful death and survival action on behalf of Berkebile who was killed while piloting a helicopter manufactured by Brantly Helicopter Corporation. 462 Pa. at 90, 337 A.2d at 897. The estate asserted four grounds of recovery: defective design; defective manufacture; inadequate warnings; and misrepresentation. *Id.* at 91, 337 A.2d at 897. A jury found for Brantly and Berkebile's estate appealed. *Id.* at 83, 337 A.2d at 893. On appeal, the Superior Court reversed, and the Supreme Court affirmed. *Id.*

¶ 13 The Supreme Court first addressed the requirement to prove a cause of action grounded in strict liability:

Strict liability requires, in substance, only two elements of requisite proof: the need to prove that the product was defective, and the need to prove that the defect was a proximate cause of the plaintiff's injuries.... Also, plaintiff must prove that the defect causing the injury existed at the time the product left the seller's hands; the seller is not liable if a product is made unsafe by subsequent changes.

*Id.* at 94, 337 A.2d at 898.

¶ 14 The Court then ruled that the lack of sufficient warnings and instructions may constitute a defect. The Court ruled that "a defective condition" is not limited to defects in design or manufacture and that the seller must assure that the product is safe for use. *Id.* at 100, 337 A.2d at 902. Specifically, a seller must give such warnings and instructions as are required to inform the user or consumer of the inherent risks or limitations of its products. *Id.* If the product is defective absent such warnings, and the defect is a proximate cause of the plaintiff's injuries, the seller is strictly liable without proof of negligence. *Id.* The Court then ruled that the question for the jury concerning warnings was:

whether the warnings appearing in the flight manual and the cockpit placard were sufficient to make Mr. Berkebile aware of the dangers of power failure

---

**3.** Section 402A provides:

Special Liability of Seller of Product for Physical Harm to User or Consumer

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it was sold.

(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

**4.** *But see, Incollingo v. Ewing*, 444 Pa. 263, 282 A.2d 206 (1971). The Supreme Court specifically determined that strict liability was not applicable to a case involving the adequacy of a warning with respect to the dangerous side effects of a drug. The Court determined, rather, that the case was properly decided on the basis of negligence principles under section 388 of the RESTATEMENT (SECOND) OF TORTS, dealing with the liability of a supplier of a chattel known to be dangerous for its intended use. *Id.*, 444 at 288 n. 9, 282 A.2d at 220 n. 8.

and delayed autorotation, and whether said warnings adequately conveyed the urgency of the situation and the need to react almost instantaneously. If the jury determines that the helicopter was in a defective condition by the failure to provide sufficient warnings and directions for use, the seller is liable for all harm caused thereby.

It must be emphasized that the test of the necessity of warnings or instructions is not to be governed by the reasonable man standard. In the strict liability context we reject standards based upon what the "reasonable" consumer could be expected to know, or what the "reasonable" manufacturer could be expected to "foresee" about the consumers who use his product.... Rather, the sole question here is whether the seller accompanied his product with sufficient instructions and warnings so as to make his product safe. This is for the jury to determine.

*Id.* at 101, 337 A.2d at 902.

¶ 15 In *Walton v. Avco Corp.*, our Supreme Court addressed the issue of a manufacturer's post-sale duty to warn about defects existing in a product at the time of sale. There, the manufacturer of a helicopter (Hughes) and the manufacturer of a component engine (Avco) were found liable for the deaths of a pilot and passenger as a result of a defective oil pump in the engine. 530 Pa. at 568, 610 A.2d at 454. Before the crash, but after the engine had been sold, Avco had learned that the engine contained a defective oil pump that was defective at the time of sale of the pump. *Id.* at 571, 610 A.2d at 456. Avco had issued a service instruction advising of the defect and providing a detailed procedure for correcting the defect. *Id.* The service instruction had been communicated to Hughes, but Hughes had failed to forward the contents of the service instruction to the owner of the helicopter or to authorized helicopter service centers. *Id.* at 573, 610 A.2d at 457. A year after the service instruction had been issued, the engine in the subject helicopter was overhauled but the oil pump was not repaired because the service company had not been advised of the service instruction. *Id.*

¶ 16 The jury found that the engine of the helicopter was defective in design and that the defect caused the deaths of the pilot and passenger. *Id.* at 573, 610 A.2d at 457. The jury also determined that Hughes' failure to warn was an independent design defect and a substantial contributing factor in the resulting deaths. *Id.* The Supreme Court ruled that Hughes had a post-sale duty to warn of the defective engine manufactured by Avco where the engine was defective from the date of its manufacture and where Hughes had been given prior notice of the defect. *Id.* at 574–75, 610 A.2d at 458.

¶ 17 This Court has ruled that no post-sale duty to warn about technological advances exists where no defect existed in the product at the time of sale. *Lynch v. McStome and Lincoln Plaza Associates*, 378 Pa.Super. 430, 548 A.2d 1276 (1988). Lynch was injured when an escalator she was riding came to an abrupt stop. *Id.* Lynch sued the manufacturer of the escalator, the service company of the escalator, and the owner of the premises where the escalator was located. *Id.* She alleged that they were negligent and that their negligence caused her injuries. *Id.* The jury returned a verdict for the defendants, and Lynch appealed. *Id.* at 1276–77.

¶ 18 On appeal, Lynch argued that the trial court erred in refusing to allow evidence that the manufacturer had failed to notify the owner of the premises that a new escalator braking system allowed for longer stopping distances and, further, had failed to put the new system on the escalator after its sale. *Id.* at 1277. The evidence revealed that the manufacturer had applied the new braking system to later produced escalators. *Id.* at 1279. This Court ruled that, whether the claim is grounded in negligence or strict liability, no post-sale duty to warn about changes in technology existed where the product was

not defective at the time of sale. *Id.* at 1281. We stated:

> There is no duty upon the seller of a machine faultlessly designed and manufactured, such as this ..., to notify its customers after the time of sale of changes in the state of the art concerning the safe operation of such machine and advise them to install any new, updated or improved safeguards developed since the time of sale. Whether this claim, essentially one of failure to warn, is viewed as sounding in negligence, ... or strict liability, ... makes no difference.
>
> \*     \*     \*
>
> We recognize that there are products liability cases from other jurisdictions which speak of a manufacturer's or seller's "continuing duty to warn." ... Our review of these cases leads us to conclude that this phrase has been used most often to describe no more than the obligation imposed where a manufacturer or seller, believing that it has sold a non-defective product, subsequently learns that its product was, in fact, defective when placed in the stream of commerce. In these circumstances, saying that there is a "continuing duty to warn" is, of course, a tacit recognition that the duty existed in the first instance. Such an obligation is not at all synonymous, however, with the claim—made here by plaintiff—that where a product is free from all defects when sold, the seller, nevertheless, has a duty to monitor changes in technology and notions of safety and, either periodically or otherwise, notify its purchasers thereof. For where, as here, no initial duty

to warn exists, none can be said to "continue."

*Lynch*, 548 A.2d at 1281.

¶ 19 The principles underlying *Lynch* apply here and when read in light of *Berkebile* and *Walton*, persuade us to decline to adopt Section 10. First, contrary to *Berkebile*, Section 10 eliminates the requirement that a plaintiff must demonstrate evidence of a defect at the time of sale. In order to prevail under strict liability claims, in Pennsylvania, a plaintiff must demonstrate that: (1) the product was defective; (2) the defect existed when it left the hands of defendant; and, (3) the defect caused the harm. *Berkebile*, 462 Pa. at 98, 337 A.2d at 898; *Ellis v. Chicago Bridge & Iron Co.*, 376 Pa.Super. 220, 545 A.2d 906, 909 (1988). Adoption of Section 10 would eliminate the requirement that a defect existed when it left the hands of the defendant.

¶ 20 Second, contrary to *Berkebile*, Section 10 specifically injects negligence principles into strict products liability. Comment b to Section 10 provides: "the standard governing the liability of sellers is objective: whether a reasonable person in the seller's position would provide a warning. This is the standard traditionally applied in determining negligence." Our Supreme Court specifically rejected this concept in *Berkebile*, stating: "[W]e hold today that the 'reasonable man standard' in any form has no place in a strict liability case." *Id.*, 462 Pa. at 96, 337 A.2d at 900. Our colleagues in the federal courts when applying Pennsylvania law have observed: "The Pennsylvania Supreme Court, perhaps more than any other state appellate court in the nation, has been emphatic in divorcing negligence concepts from product-liability doctrine." *Conti v. Ford Motor Company*, 578 F.Supp. 1429, 1434 (E.D.Pa.1983).[5] The

---

**5.** This Court has also rejected the injection of negligence principles into strict liability, stating:

> The liability arising from inadequate warnings is not "strict" in the same sense as liability arising from a defect due to fault in manufacture, since a determination of

whether an object is unreasonably dangerous without adequate warnings, and thus defective, necessarily involves negligence principles such as reasonableness or foreseeability.

*Ellis*, 545 A.2d at 912–913. *See also Dambacher by Dambacher v. Mallis*, 336 Pa.Super.

standard specifically rejected by the Supreme Court in *Berkebile* is the negligence standard advanced by Section 10.[6] We decline to adopt Section 10.[7]

¶ 21 Order affirmed.

¶ 22 HESTER, J., files a Dissenting Opinion.

HESTER, J., dissenting:

¶ 1 I respectfully dissent.

¶ 2 There is no dispute as to the facts. In 1964, the Frick Company designed, manufactured, and installed a freezer system in the plant of Town Square Foods. The plant then was acquired by Rich Products Corporation, the owner at the time of the unfortunate accident that resulted in the death of Angela L. DeSantis. Ms. DeSantis died as the result of inhaling anhydrous ammonia that had been released into the workplace when a valve on the freezer ruptured from "hydraulic shock," a condition which sometimes occurs when liquid ammonia used as a refrigerant condenses and accumulates in a freezer coil during manual defrosting.

As the trial judge, the Honorable John A. Bozza, P.J. set forth in his opinion:

In the mid to late 1980's, manufacturers of industrial freezers of the type at issue in this case began installing a "liquid drainer," which prevented condensed liquid and ammonia from accumulating and reduced the chance of hydraulic shock. In addition, in the early 1990's, a device known as a "scrubber" was developed which had the effect of dissipating inordinate pressure which would build up behind the valves as a result of the accumulation of liquid ammonia in freezer coils. Information concerning the use

22, 485 A.2d 408, 428 (1984) (holding principles of negligence have no place in a strict liability case.)

**6.** We also observe that assuming we did adopt Section 10, Appellant has failed to meet the four elements necessary to establish a post-sale duty to warn. The first element is that the seller knows or reasonably should know that the product poses a substantial risk of harm to persons or property. The record reveals no evidence that Frick was aware of any risk respecting the refrigeration system. Trial Court Opinion, 10/27/98, at 5.

The second element under Section 10(b) is that those to whom a warning might be provided can be identified and can reasonably be assumed to be unaware of the risk of harm. The record reveals that Frick originally manufactured the refrigeration system for Town Square Foods, Inc., in 1964, almost 30 years before the incident at issue. *See* Frick's Answer and New Matter, at ¶ 7. Frick stopped manufacturing the system during the time period of the late 1960's and Rich Products, Appellant decedent's employer, purchased the plant from Town Square Feeds, Inc. Trial Court Opinion, 10/27/98, at 1–2. In addition, a fire at Frick Company headquarters destroyed the majority of company customer records on November 17, 1988. *See* Deposition of Bruce Schaeffer, 4/6/98, at 50–51. Thus, the record fails to reveal that Frick could have identified the customers or current users.

The third element under Section 10(b) is that a warning can be effectively communicated to and acted upon by those to whom a warning might be provided. The record does not reveal that Appellant demonstrated a warning could have been effectively communicated to and acted upon by Rich Products, the successor to town Square Foods, Inc., particularly in light of the fact that 30 years had passed and a fire had destroyed customer records. *See supra* Deposition of Bruce Schaeffer.

The fourth element under Section 10 is that the risk of harm is sufficiently great to justify the burden of providing a warning. Here, the record reveals that the refrigeration system operated 29 years without incident. *Id.* at 61–63; 74–75. Bruce Schaeffer, an engineer with Frick since 1968, testified that the incident in question was the only rupture of a Frick liquid ammonia refrigeration system that he was aware of in his tenure with the company. *Id.* The record further reveals that Appellant's own expert, Anthony Schneider, investigated the rupture and acknowledged in his report that operator error was the cause of the rupture in this case and could have been avoided. *See* Webber/Smith Associated Site Visit Report, 6/10/93, at 2–3.

**7.** In light of our disposition that summary judgment was appropriate because this Commonwealth recognizes no post-sale duty to warn, we need not address the issue of whether the statute of repose bars Appellant's claim.

of these devices was disseminated throughout the freezer industry and Frick would have been aware of it through trade publications or other means. Frick did not advise Rich or other freezer customers of their utilization. Had one or both of these devices been installed on Rich's freezer system, the likelihood that the valve in question would have ruptured would have been significantly diminished.

Trial Court Opinion, 10/27/98, at 1–3.

¶ 3 Frick is a member of the International Institute of Ammonia Refrigeration. In 1989 and 1990, that organization disseminated publications dealing with hydraulic shock in ammonia systems and how to avoid component failure in industrial refrigeration systems caused by abnormal pressure or shock. Frick was aware of those documents and the situations discussed therein as well as the recommendations to eliminate the possibility of hydraulic shock.

¶ 4 It is obvious that the condition causing the death of Miss DeSantis as well as methods of eliminating those conditions was receiving considerable attention from the industry. Frick did nothing to warn Rich of the dangerous condition or to suggest means of eliminating or correcting that condition.

¶ 5 In my judgment, the fact situation before us imposed upon Frick a duty to warn Rich of the explosive release of ammonia from the industrial freezer installed by Frick as well as of the availability of safety devices to prevent such release.

¶ 6 The imposition of that duty to warn is supported by our Supreme Court's holding in *Walton v. Avco Corp.*, 530 Pa. 568, 610 A.2d 454 (1992).

¶ 7 I would reverse the summary judgment and remand for further proceedings.