**Fisher v. Elbeco Inc.**

*Shelly Farber,* for plaintiff.
*Margaret Sherry Lurio,* for defendant.

LASH, *J.,* June 9, 2010—Defendant, Elbeco Inc., filed a motion for summary judgment arising out of an alleged violation of the Pennsylvania Human Relations Act, 43 P.S. §951, et seq. Plaintiff, Shirley Fisher, contends Elbeco terminated her employment in retaliation for protesting sexual harassment in the workplace and engaging in other "protected activity" which Fisher defines as discussing at the workplace retaliatory conduct she allegedly was subjected to because she initially complained about sexual harassment in 1995. Elbeco responds that Fisher was terminated from employment for appropriate reasons and specifically not because she reported sexual harassment in the workplace in 1995 or in retaliation for later discussing the 1995 report. Argument was held April 22, 2010. For reasons set forth herein, we grant Elbeco's motion.[1]

Elbeco hired Fisher in 1990 as an order picker. (Fisher deposition, p. 16.) In 1993, she was moved to the sewing room, where she remained until the time of her discharge. (Fisher deposition, p. 17.) According to Fisher, the switch was made because Nancy Haas, the warehouse supervisor, subjected her to "unfair treatment" and was giving her "a lot of the bigger orders." (Fisher deposition, pp. 19, 21.) As Fisher put it, Nancy Haas

---

1. On May 21, 2010, Fisher filed a cross motion for summary judgment. Our ruling on Elbeco's motion renders Fisher's motion moot and, accordingly, the motion shall be denied.

"would consistently be on my case about something." *Id.* Once she moved to the sewing room, Fisher would report in the first instance to the lead person, Marie McFadden. Nancy Haas remained her supervisor. (Fisher deposition, p. 22.) Ms. McFadden delegated the work in the sewing room. (Fisher deposition, p. 24.)

In 1995, Fisher made a complaint of sexual harassment against Nancy Haas. Fisher told Robert Pavalucci,[2] a member of Elbeco management, that on five or six occasions Nancy Haas looked at her while she was in a bathroom stall. During each of these incidents, Fisher and Ms. Haas were alone in the bathroom. Fisher believed this to be sexual harassment as Fisher knew that Ms. Haas was gay. (Fisher deposition, p. 32.) Mr. Pavalucci said he would investigate the incident. (Fisher deposition, p. 25.) Mr. Pavalucci then contacted Cynthia Lurio, a Human Relations representative, and brought this matter to her attention. (Fisher deposition, p. 26.) Mrs. Lurio and Charles Knoll, the business agent for the company's union, met with Fisher and discussed her complaint. Mrs. Lurio told Fisher that the matter would be taken care of without any retaliation against Fisher in the future. (Fisher deposition, p. 28.) Mrs. Lurio also said she had spoken with Nancy Haas and that the situation would be resolved. (Fisher deposition, pp. 29-30.) No further action was taken.

After 1995 or early 1996, Fisher never complained again to anyone at Elbeco about sexual harassment. (Fisher

---

2. In his deposition, David Lurio testified he did not know a Robert Pavalucci but that a Robert Cavalucci worked at Elbeco in 1995 as vice president of manufacturing. (Lurio deposition, p. 59.)

deposition, pp. 34-35.) However, Fisher alleges that subsequently she did have two meetings with David Lurio, Elbeco's President, to express her ongoing concerns about Nancy Haas. The first meeting occurred some time before 2002. (Fisher deposition, p. 41.) After a labor-management meeting, Fisher complained to David Lurio and Anne Conway, a human relations representative, "that I just wanted this harassment and retaliation to stop, it's gone on long enough, and it was because of a complaint that was made . . . ." (Fisher deposition, p. 44.) Fisher said that Nancy Haas complained about Fisher going to the bathroom too many times and that she didn't want Fisher talking to anybody. Fisher characterized this behavior as "nit-picking." (Fisher deposition, p. 50.) Fisher also complained that she was being constantly watched and monitored. *Id.*

Some time between six months to a year before her termination, Fisher again complained to David Lurio at another labor-management meeting. Nancy Haas and approximately 15 other Elbeco employees were present at that time. (Fisher deposition, pp. 58-59.) Fisher asked when Nancy Haas' retaliation was going to end. (Fisher deposition, p. 59.) As far as Fisher recalls, there "wasn't much of a comment" on the part of Elbeco management to Fisher's allegations. (Fisher deposition, p. 62.)

Other than the two meetings, Fisher never complained to Elbeco management about any "retaliation" committed by Nancy Haas after 1996, (Fisher deposition, p. 62), nor did Fisher file any written complaint with human resources or the vice president of manufacturing about retaliation. (Fisher deposition, pp. 65-66.)

On July 30, 2003, Fisher filed a grievance alleging that Elbeco violated the union contract by failing to post a job opening for the position of lead person. (Fisher deposition, p. 77.) Fisher had coincidentally learned of the opening by seeing an advertisement for the position in the *Reading Eagle-Times.* (Fisher deposition, p. 74.)

Fisher's termination occurred on July 30, 2003. At that time, Marie McFadden instructed Fisher to go to the conference room. (Fisher deposition, pp. 82-83.) Present at the meeting were David Lurio, Marie McFadden, and Bonnie Bowers, a human resource liaison. (Fisher deposition, p. 83.) David Lurio was the only one who spoke. He told Fisher that it had been brought to his attention that she was continuing to discuss her complaint of sexual harassment arising in 1995, a matter that she was advised not to discuss. This was causing a stressful work environment among her co-workers, cause for immediate dismissal. (Fisher deposition, p. 83.) Fisher responded that she had never spoken about it and could not believe that Mr. Lurio was "believing these lies." (Fisher deposition, p. 84.) Mr. Lurio did not say who was making the complaints. Fisher was terminated and after the meeting, escorted from the building. (Fisher deposition, p. 85.) Elbeco then issued a discipline notice, which sets forth the reasons for Fisher's discharge, stating, in part:

"When Shirley Fisher spoke to the Human Resource Director concerning a situation several years ago involving Shirley and Nancy Haas, Shirley was told to keep her comments to herself and do her job. We have learned that fellow workers are being told about the original situation. At that time, both parties were told by Cynthia Lurio and Mary Lou Seiders not to talk about it."

On October 18, 2004, Fisher filed a charge of discrimination against Elbeco with the Pennsylvania Human Relations Commission. Fisher alleged that she had been discharged by Elbeco in retaliation for complaining about an unfair employment practice. On March 15, 2006, Fisher received a notice from the Human Relations Commission that this complaint was being dismissed and she was permitted to file a lawsuit in the court of common pleas. Subsequently, Fisher filed the present action.

In her second amended complaint, Fisher alleges that Elbeco violated the Pennsylvania Human Relations Act by terminating her employment because of her discussions with co-workers about the alleged sexual harassment that had occurred in 1995. Elbeco filed the within motion for summary judgment on July 24, 2009. On September 21, 2009, the court deferred disposition of the motion to allow the parties to complete discovery. As stated, the motion was ultimately heard on April 22, 2010.

The court applies the following standard when deciding a motion for summary judgment:

"Summary judgment will be entered only where there is no genuine issue as to any material fact and it is clear that the moving party is entitled to a judgment as a matter of law. *Skipworth v. Lead Industries Association Inc.,* 547 Pa. 224, 690 A.2d 169, 171 (1997). Summary judgment is proper in cases in which 'an adverse party who will bear the burden of proof at trial has failed to produce evidence of facts essential to a cause of action or defense in which a jury trial would require the issues be submitted to a jury.'

Pa.R.C.P. 1035.2(2)." *Jones v. SEPTA,* 565, Pa. 211, 216, 772 A.2d 435, 438 (2001).

We note preliminarily that the record in this case was predominately compiled by deposition testimony, and that consideration of this deposition testimony is crucial for a full understanding of this case. Under the *Nanty-Glo* rule, based on the holding in *Nanty-Glo v. American Surety Company,* 309 Pa. 236, 163 A. 523 (1932), summary judgment is not generally granted where the record consists solely of oral testimony. However, the law does recognize an exception to this rule:

"The general rule flowing from *Nanty-Glo v. American Surety Co.,* 309 Pa. 236, 163 A. 523 (1932), is that summary judgment may not be had where the moving party relies exclusively upon oral testimony, either through testimonial affidavits or deposition testimony, to establish the absence of a genuine issue of material fact. Where the moving party supports its motion for summary judgment by using the admissions of the opposing party, however, even though they are testimonial, *Nanty-Glo* does not forbid the entry of summary judgment. In such a situation, the court may grant the motion without determining the credibility of the testimony, for it is an 'unconditional surrender' by the opposing party, to which he must be held. See *Garcia v. Savage,* 402 Pa. Super. 324, 586 A.2d 1375, 1378 (1991)." *Bowe v. Allied Signal Inc.,* 806 A.2d 435, 440 (Pa. Super. 2002).

After review of the record, and in particular Fisher's testimony at deposition, we are comfortable that this matter can proceed to summary judgment without violating the *Nanty-Glo* rule.

Our analysis is governed by the United States Supreme Court case of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

"First, the plaintiff bears the initial burden of establishing a prima facie case of discrimination. *Reeves v. Sanderson Plumbing Products Inc.,* 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); *Jacques [v. Akzo International Salt Inc.,* 422 Pa. Super. 419, 619 A.2d 748 (1993)]. The burden on the plaintiff of presenting a prima facie case under *McDonnell Douglas* is 'minimal.' *James v. New York Racing Association,* 233 F.3d 149, 153 (2d Cir. 2000). If the plaintiff cannot meet this minimal burden, the employer is entitled to judgment as a matter of law. See *Pivirotto v. Innovative Systems Inc.,* 191 F.3d 344, 352 n.4 (3d Cir. 1999).

"If the plaintiff does establish a prima facie case, a presumption of discrimination arises, and the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for the challenged employment decision. *Reeves, supra; Jacques, supra.* The employer's burden in this second part is one of production, not persuasion, and thus involves no credibility assessment. *Reeves, supra.* If the employer articulates a legitimate business explanation, 'then the presumption of discriminatory intent created by the employee's prima facie case is rebutted and the presumption simply "drops out of the picture." ' *Seman v. Coplay Cement Co.,* 26 F.3d 428, 432 (3d Cir. 1994) (quoting *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)).

"If the employer satisfies its burden of production, the third and final part of the *McDonnell Douglas* framework

gives the plaintiff the opportunity to show that the legitimate reasons proffered by the employer were pretexts for what, in reality, was a discriminatory motivation. See *Simpson v. Kay Jewelers,* 142 F.3d 639, 644 n.5 (3d Cir. 1998). In the pretext discrimination case, 'the employer need not prove that the tendered reason actually motivated its behavior, as throughout this burden-shifting paradigm the ultimate burden of proving intentional discrimination always rests with the plaintiff.' *Fuentes v. Perskie,* 32 F.3d 759, 763 (3d Cir. 1994)." *Kroptavich v. Pennsylvania Power and Light Company,* 795 A.2d 1048, 1055 (Pa. Super. 2002)

Fisher claims she is the victim of retaliatory discharge. Section 5(d) of the Pennsylvania Human Relations Act, 43 P.S. §955(d), defines as an unlawful discriminatory practice "For any person, employer, employment agency or labor organization to discriminate in any manner against any individual because such individual has opposed[3] any practice forbidden by this act, or because such individual has made a charge, testified or assisted, in any manner, in any investigation, proceeding or hearing under this act."

As stated in *McDonnell Douglas, supra,* to prevail Fisher must first establish a prima facie case of retaliatory discharge. A prima facie case for retaliatory discharge requires a finding of three elements:

---

3. The United States Supreme Court in Crawford v. Metropolitan Government of Nashville, 129 S.Ct. 846 (2009), interpreted identical language found at title 42 U.S.C. §2000e-3(a). The court defined the term "oppose" to carry the original dictionary meaning of "resisting or contending against" and did not require active or instigating behavior.

"(1) he engaged in a protected activity; (2) he was discharged subsequent to or contemporaneously with such activity; and (3) there is a causal link between the protected activity and the discharge. *Griffiths v. CIGNA Corp.,* 988 F.2d 457, 468 (3d Cir.), *cert. denied,* 510 U.S. 865, 114 S.Ct. 186, 126 L.Ed.2d 145 (1993). 'Protected activity' includes informal protests of discrimination such as complaints to management. *Harris v. SmithKline Beecham,* 27 F. Supp.2d 569 (E.D. Pa. 1998)(citing *Barber v. CSX Distribution Services,* 68 F.3d 694, 702 (3d Cir. 1995))." *Bailey v. Storlazzi,* 729 A.2d 1206, 1214 n.9 (Pa. Super. 1999).

Regarding the first element, Fisher maintains that she was fired for engaging in protected activity. Notably, the claimed protected activity is not identified as the complaint occurring in 1995 but instead is an argument that subsequent discussions about the 1995 complaint is itself a protected activity.

David Lurio testified at his deposition that on the day of Fisher's termination in 2003, he was briefed by Anne Conway and Elbeco's Vice President A.J. Matthews about the 1995 incident. (Lurio deposition, p. 25.) He said that was the first time he had learned about this incident. (Lurio deposition, p. 26.) At that time, Ms. Conway and Mr. Matthews told Mr. Lurio that Fisher was harassing Nancy Haas and talking to fellow employees about Haas' sexual preference, as well as the bathroom incident that had occurred eight years previously.[4] (Lurio deposition, pp. 32, 35.)

---

4. Mr. Lurio admitted Fisher did not break any company rules by discussing the 1995 incident. (Lurio deposition, p. 35.)

Mr. Lurio testified that Fisher began creating problems for Nancy Haas and other employees after Fisher was not considered for the lead position. (Lurio deposition, p. 64.) Mr. Lurio also stated Fisher did not complain about sexual harassment any time prior to her termination. (Lurio deposition, p. 65.)

At the discharge meeting, Mr. Lurio told Fisher that the environment was becoming increasingly hostile and intimidating and other employees within the building were feeling the stress. (Lurio deposition, pp. 67-68.) Mr. Lurio also told Fisher that at the time of the 1995 bathroom incident, she was directed to not talk about it again but Fisher ignored this directive.[5] (Lurio deposition, pp. 35-36, 38.) Fisher was then discharged for creating a hostile environment and harassing an employee by discussing her sexual preference.

In Fisher's desposition, she testified that after 1995 or early 1996, she never complained to anyone at Elbeco about sexual harassment. During her two meetings with Mr. Lurio before her discharge, she never complained of sexual harassment, but spoke of Nancy Haas' retaliation, her "nitpicking" behavior, and of being constantly watched and monitored. After 1996, Fisher never filed a written complaint with Human Resources or the Vice President of Manufacturing about retaliation.

Fisher admits that at her termination meeting on July 30, 2003, Mr. Lurio said he had learned Fisher was dis-

---

5. Fisher cites this statement of Mr. Lurio in support of her position.

cussing a complaint that had arose eight years previously and was not to be discussed. Fisher admits that Mr. Lurio told her that her actions in this regard were causing a stressful work environment for her co-workers, cause for immediate dismissal. Significantly, Fisher testified that she told Mr. Lurio at this time that she had never spoken about the incident and was surprised he was "believing these lies."

Applying the *McDonnell Douglas* standard, Fisher was not engaged in a protected activity at the time she was discharged. To establish a protected activity, she would have to prove that she was involved in activity that opposed discriminatory practices, here, sexual harassment. Her discussions with co-workers concerning the 1995 incident did not constitute opposition to a present or ongoing discriminatory employment practice. Instead, she was merely talking about an episode from the past. Further, by denying to Mr. Lurio that she spoke to anyone about the 1995 incident, Fisher admitted that even if discussions of that type are protected, she, nevertheless, did not engage in any protected activity. Accordingly, the first element of the prima facie case was not present.

Likewise, the second element of a retaliatory discharge claim has not been shown. The only allegedly discriminatory employment practice was the 1995 sexual harassment claim made by Fisher against Haas. However, Fisher's discharge did not stem from that claim, nor was it contemporaneous. She was discharged eight years later, and for an entirely different reason.

Finally, even assuming the discussions are considered protected activity, there is no causal or retaliatory link between this activity and Fisher's discharge.

"Even if timing alone could ever be sufficient to establish a causal link, we believe that the timing of the alleged retaliatory action must be 'unusually suggestive' of retaliatory motive before a causal link will be inferred. *Robinson [v. City of Pittsburgh]*, 120 F.3d [1286] at 1302 [(3d Cir. 1997)]. We have also held that the 'mere passage of time is not legally conclusive proof against retaliation.' *Robinson v. SEPTA*, 982 F.2d 892, 894 (3d Cir. 1993). When temporal proximity between protected activity and allegedly retaliatory conduct is missing, courts may look to the intervening period for other evidence of retaliatory animus. For example, in *SEPTA*, we stated: 'The temporal proximity noted in other cases is missing here and we might be hard-pressed to uphold the trial judge's finding [of causal link] were it not for the intervening pattern of antagonism that SEPTA demonstrated.' *Id.* at 895 (internal citation omitted); *accord Woodson [v. Scott Paper Co.]*, 109 F.3d [913], at 920-21 [(3d Cir. 1997)]." *Krouse v. American Sterilizer Co.*, 126 F.3d 494, 503-504 (3d Cir. 1997).

Here, there is an extensive passage of time. Further, there is no pattern of antagonism, merely two complaints by Fisher to management about "nit-picking" behavior and undefined retaliation. The third element of retaliatory discharge has not been established.

In essence, Elbeco did not fire Fisher because she was "resisting or contending against" illegal employment practices. Rather, her employment was terminated be-

cause she was speaking about Ms. Haas' sexual identity to other employees and continuing to rehash the 1995 episode, all of which caused a stressful work environment.

Fisher has failed to meet her burden of proving a prima facie case of retaliatory discharge required by the *McDonnell Douglas* analysis. Accordingly, we will grant summary judgment.

### ORDER

And now, June 9, 2010, after argument held, it is hereby ordered that defendant, Elbeco Inc.'s, motion for summary judgment is granted and judgment is entered in favor of the defendant, Elbeco Inc., and against plaintiff, Shirley Fisher.

Plaintiff's counter motion for summary judgment is denied.