NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 10-4287/11-1087
_____

BERISH BERGER; KILBRIDE INVESTMENTS LIMITED; BUSYSTORE LIMITED;
TOWERSTATES LIMITED; BERGFELD CO. LIMITED; ARDENLINK  LIMITED,

v.

RICHARD ZEGHIBE; PATRIOT PARKING INC.; JAMES RAPPOPORT; DDI
ARCHITECTS, P.C.; DAROFF DESIGN, INC.; DAROFF DESIGN INC+  DDI
ARCHITECTS, P.C.; JATINDER CHAWLA; ELI WEINSTEIN; RAVINDER
CHAWLA; MARK SAHAYA; 2040 MARKET ASSOCIATES, LP; JFK BLVD
ACQUISITION PARTNERS, L.P.; PINE PROJECTS LLC; WORLD ACQUISITION
PARTNERS CORPORATION,

RAVINDER CHAWLA;
WORLD ACQUISITION PARTNERS CORPORATION,
                                        Appellants in 10-4287

ELI WEINSTEIN;
PINE PROJECTS LLC,
                                        Appellants in 11-1087
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 08-cv-5861)
District Judge:  Hon. Berle M. Schiller
_____

Submitted Under Third Circuit LAR 34.1(a)
January 10, 2012

Before:  FUENTES, JORDAN, and NYGAARD, *Circuit Judges*.

(Filed:  February 23, 2012)
_____

OPINION OF THE COURT

_____

JORDAN, *Circuit Judge*.

Berish Berger and a series of closely held corporate entities (the "Berger Entities") sued Ravinder Chawla, Eli Weinstein, and their associated corporate entities, alleging that they fraudulently induced Berger to cause the Berger Entities to invest $36.5 million in two real estate transactions. After a two-week jury trial, the United States District Court for the Eastern District of Pennsylvania entered judgment in accordance with a jury verdict against Chawla, Weinstein, and the defendant corporations, and denied those parties' post-judgment motions challenging the verdict. Chawla, Weinstein, and their entities appealed. For the reasons that follow, we will affirm.

I.    **Background**[1]

In 2007, Berger, a citizen of the United Kingdom, sued Chawla, Chawla's related corporate entity World Acquisitions Partners Corporation ("WAPC"), Weinstein, and Weinstein's related corporate entity Pine Projects LLC ("Pine"), claiming fraud. Berger had caused each of the Berger Entities[2] to give money to Pine in exchange for what

_____

[1] Because we write only for the benefit of the parties, we assume familiarity with the facts. In setting forth the background, we recount the facts in the light most favorable to the prevailing parties. *See generally Intermilo, Inc. v. I.P. Enters., Inc.*, 19 F.3d 890, 892 (3d Cir. 1994) (stating that, after a jury trial, facts are reviewed to "'determine whether the evidence and justifiable inferences most favorable to the prevailing party afford any rational basis for the verdict'" (quoting *Bhaya v. Westinghouse Elec. Corp.*, 832 F.2d 258, 259 (3d Cir. 1987))).

[2] As discussed further *infra*, the Berger Entities include five foreign companies: (1) Kilbride Investments Limited, (2) Busystore Limited, (3) Towerstates Limited, (4)

2

Berger believed were investments in two real estate development projects in Philadelphia, Pennsylvania, known as "River City" and "2040 Market Street." The District Court granted summary judgment against Berger on the ground that the Berger Entities, not Berger himself, had standing to pursue the claims in Berger's complaint. Berger appealed that decision, and we affirmed. *See Berger v. Weinstein*, 348 F. App'x 751 (3d Cir. 2009) (non-precedential) [hereinafter *Berger* I]. As a result of our disposition in *Berger* I, Berger filed a new complaint on behalf of the Berger Entities after he had obtained assignments from them that permitted him to assert whatever claims they had against Chawla, WAPC, Weinstein, and Pine.

A.      *The Investments in River City and 2040 Market Street*

Berger's new action went to trial, at which he sought to prove that the defendants fraudulently procured the Berger Entities' investments in the River City and 2040 Market Street properties.

1.      *River City*

Chawla contracted to purchase the River City property for $32.5 million, intending to sell it to someone else for a profit. Shortly after beginning that transaction but before closing on the property, Chawla learned of a new height restriction ordinance pending in the Philadelphia City Council that, if passed, would impose a height limitation of 125 feet on a portion of River City's development. While it was understood that River City's value would be greatly diminished as a result of the height limitation, Chawla entered

Bergfeld Co. Limited, and (5) Ardenlink Limited.

3

into an agreement with Weinstein whereby Weinstein would, in the future, purchase that property from Chawla for $62.5 million. Weinstein eventually became aware of the height limitation, but nevertheless worked with Chawla to try to acquire the money to pay the $62.5 million purchase price.

To that end, Mark Sahaya, a real estate broker, helped organize a meeting at the office of an architect, James Rappoport, whom Chawla had retained to prepare proposed development designs for River City. Berger was invited by Weinstein to attend that meeting, and, on the appointed date, he arrived and was greeted by Chawla and Weinstein.[3] Chawla and Weinstein introduced themselves to Berger as partners and proceeded to show him a presentation based on Rappoport's proposed design. Berger was not, at any time, apprised of the pending height limitation or the impact it would have on the development of the River City property. Instead, the presentation led him to believe that there were no such limitations. After the presentation, Weinstein and Chawla gave Berger a driving tour of the River City site, and again failed to mention the pending height restriction ordinance that would limit River City's development.

---

[3] In the correspondence leading up to the meeting, Sahaya did not indicate that Berger was a potential investor or describe any role he might play in contributing funds towards River City's development. Instead, Sahaya stated only that the meeting would be conducted with "[Weinstein's] investor group." (App. at 574.) As a result, when they met with Berger, the attendees at the meeting were not necessarily aware of the role the Berger Entities might have in contributing funds. Berger, however, testified that "it [was] understood" that he would have appeared at the meeting on "behalf of … [his] companies" as everyone "would be expecting that [he] was investing on behalf of corporations, which is normal in real estate situations." (App. at 1022-23.)

4

A few days after the meeting, Chawla arranged for Berger to receive an appraisal of River City dated June 23, 2006, valuing the property at $77 million.[4] Although Berger had not yet decided to invest in River City, the appraisal corroborated the meeting's pitch that River City was a good investment and that he should participate in the project. Like the representations made at the meeting, however, the appraisal was far less than truthful; it falsely suggested that Chawla would be purchasing the property for $50 million rather than the $32.5 million Chawla had actually contracted to expend in acquiring it, and, despite the pending height restriction ordinance, it affirmatively stated that there was no applicable height limitation.

Relying on the appraisal, Berger caused one of the Berger Entities – Kilbride Investments Limited ("Kilbride") – to make a $12 million payment to facilitate purchase of the River City property.

2.  *2040 Market Street*

While at the River City property meeting, Berger saw a model of a separate property that Chawla and Weinstein were also involved in developing, which was located at 2040 Market Street. As was true of River City, Weinstein had agreed to buy that property from Chawla and sought capital to facilitate his purchase. Weinstein explained to Berger that a sale of air rights associated with the property was imminent and that he needed $9.5 million dollars to make that acquisition. Berger agreed to help Weinstein do that by investing in the property.

---

[4] Chawla testified that he did not intend for Berger to receive the appraisal, but acknowledged that it was sent by his office to London.

Thus, a day after having caused Kilbride to invest in River City, Berger caused another of the Berger Entities – Busystore Limited – to make a $9.5 million payment to Pine for the purpose of purchasing 2040 Market Street's air rights. Shortly thereafter, Berger received a copy of a letter addressed to Weinstein that falsely implied that a third party was interested in increasing a previously-made offer for the air rights.[5] Later, and in response to Weinstein's demands for additional funds, Berger caused other Berger Entities to send money to Pine: Towerstates Limited transferred $4 million, Ardenlink Limited transferred $6 million, and Bergfeld Co. Limited transferred $5 million.

B.    *Weinstein's Requests for Additional Funds and Berger's Actions*

Despite those substantial investments, Weinstein continued to ask Berger for more money, which aroused Berger's suspicions. Berger thus engaged a lawyer to determine how the money from the Berger Entities had been spent. Berger and his attorney met with Weinstein and his attorney, after which Berger received a January 29, 2007 letter from Weinstein's attorney that served to "memorialize [Berger's] discussion with … Weinstein that took place [the previous day] in [Weinstein's attorney's] New York office on Sunday, January 28, 2006 [sic]." (App. at 2610.) The letter, sent by fax, detailed how Weinstein had expended funds and referenced attached checks that would corroborate the explanations therein. However, although the checks seemed to verify the representations

---

[5] The letter Berger received was dated December 21, 2006, stated it was "further to [a prior] letter dated 7/21/06," and purported to increase a previous offer made in that prior letter. (App. at 1758.) The referenced July 21, 2006 letter, however, was – like the letter Berger received – actually prepared in December 2006 by Sahaya on Chawla's company's computers. Weinstein paid $45,000 to have Sahaya arrange for the letters' creation.

in the letter, they were actually in furtherance of fraud because some of them were entirely falsified and others were never in fact negotiated.[6]

Berger did not cause any additional funds to be sent after receiving the letter and the checks, but the damage was done; in total, the Berger Entities invested $36.5 million in the two properties.[7]

---

[6] Berger testified that he believed the letter and checks were from Weinstein, based on a fax header that indicated that some of the materials were sent by Pine. Weinstein, however, suggested at trial that the fax might not have been sent from a fax machine in his office. In response, the District Court asked Weinstein whether "someone c[a]me into [his] office" or "[s]ome stranger walked into [his] office" to send the fax. (Supp. App. at 655.) Weinstein acknowledged that no one had done so, but nevertheless implied the materials were not sent by him because an explanatory cover sheet would have been sent along with the materials if they were. That cover sheet, as Weinstein explained, would have served to mitigate any deception caused by its absence. However, because Weinstein did not produce the cover sheet for trial and had never seen it, the District Court struck his testimony to that effect.

[7] At trial, Weinstein tried to establish that he had appropriately invested Berger's money and was, himself, a victim of Chawla's misconduct. Among other things, he wanted to show that he had spent some of Berger's money in buying out investors in 900 Delaware Avenue, a separate property which was not the subject of the dispute at trial. According to Weinstein, the facts attendant to that transaction would show that he had been acting appropriately with respect to Berger's 2040 Market Street investment, as the 900 Delaware Avenue transaction would have permitted Weinstein to proceed with the 2040 Market Street deal. Berger objected to Weinstein's testimony because there was no documentation supporting it, and the Court reprimanded Weinstein's counsel in the jury's presence:

> The Court: No. I want to tell you something --
>
> [Weinstein's Attorney]: Yes, your Honor.
>
> The Court: -- I've been letting you stray off into a parallel galaxy here and I'm a little upset about it.
>
> [Weinstein's Attorney]: I will try not to your Honor, but it's –
>
> The Court: I want you to focus on this deal and this lawsuit. I don't want to hear about what happened somewhere else as a figment of imagination or thought or whatever.

C.    *Procedural History*

This lawsuit followed and, after hearing the evidence, the jury returned a verdict in

Berger's favor against Chawla, WAPC, Weinstein, and Pine.  The jury determined that

Weinstein and Berger had entered into a contract, but that Weinstein and Pine were liable

for fraud, conspiracy to defraud, and unjust enrichment.  It also found Chawla and

WAPC liable for conspiracy to defraud.  The jury awarded Berger $33 million in

compensatory damages, with Chawla and WAPC responsible for 5% each, Weinstein

responsible for 70%, and Pine responsible for 20%.

Chawla and WAPC filed a post-judgment motion under Federal Rule of Civil

Procedure 50(b), arguing that they were entitled to judgment as a matter of law because

there was insufficient evidence to establish that they acted with the requisite intent to

injure the Berger Entities.  Weinstein and Pine filed a post-judgment motion under Rule

59, reasoning that the existence of a contract between Berger and Weinstein barred

---

…

> The Court:  There is nothing in exhibits that documents this scheme, plan, idea or whatever.

(Supp. App. at 858.)  Despite that admonition, Weinstein's counsel again elicited testimony regarding 900 Delaware Avenue.  She argued to the Court that she had to introduce that testimony so as to explain some of the representations made in Weinstein's lawyer's letter.  The Court disagreed:

> The Court: There's nothing to explain, they saw the letter.
>
> …
>
> [Weinstein's Attorney]: -- it was -- the $23 million mortgage, it is referred to in the letter… .
>
> The Court: He already explained what the $23 million mortgage was, the rest of it … is all … a plan, a scheme, an artifice … I don't know what.

(Supp. App. at 862.)

8

Berger's tort claims and unjust enrichment claim.  In the alternative, Weinstein and Pine

sought a new trial on the ground that the District Court's behavior during trial evinced

bias against Weinstein.  The District Court entered separate orders denying the

defendants' motions.

These timely appeals followed.

## II.    Discussion[8]

### A.    *Chawla and WAPC's Appeal*

Chawla and WAPC (collectively, the "Chawla Appellants") argue that the District

Court erred in denying their motion for judgment as a matter of law because the evidence

did not support a finding that they had the requisite intent to harm the Berger Entities.

We exercise plenary review of the District Court's order, and therefore determine

whether, "viewing the evidence in the light most favorable to … [Berger] and giving

[Berger] the advantage of every fair and reasonable inference, there is [sufficient]

evidence from which a jury reasonably could find liability."  *Brennan v. Norton*, 350 F.3d

399, 424 n.20 (3d Cir. 2003) (citation omitted).

Under Pennsylvania law, a plaintiff proceeding on a civil conspiracy claim must

show that two or more persons "acted in concert to commit an unlawful act or do a lawful

act by unlawful means, and that they acted with malice."  *Skipworth ex rel. Williams v.

Lead Indus. Ass'n, Inc.*, 690 A.2d 169, 174 (Pa. 1997); *see Petruska v. Gannon Univ.*,

462 F.3d 294, 309 n.13 (3d Cir. 2006).  The Chawla Appellants acknowledge that the

---

[8] The District Court had jurisdiction pursuant to 28 U.S.C. § 1332.  We have
jurisdiction over these appeals under 28 U.S.C. § 1291.

evidence presented would suffice to meet Berger's burden were he asserting a civil conspiracy claim in his own right. (*See* Chawla's Opening Br. at 32-33 ("If Berger had standing to bring a civil conspiracy claim … and obtained a favorable jury verdict on this issue, then there would have been legally sufficient evidence … .").) They argue, however, that Berger's status as an assignee of the Berger Entities precludes liability because the evidence established that the Chawla Appellants intended to injure Berger, not the Berger Entities. *See Thompson Coal Co. v. Pike Coal Co.*, 412 A.2d 466, 472 (Pa. 1979) (describing "[p]roof of malice" as the "intent to injure"). Pointing out that they did not even know the Berger Entities existed until Berger caused those entities to invest in the River City and 2040 Market Street projects, *see supra* note 3, the Chawla Appellants contend that Berger cannot demonstrate that they acted with the requisite malice in this case. We disagree.

In *Thompson Coal*, the court set forth the elements for civil conspiracy and concluded that the defendant's actions did not give rise to a civil conspiracy claim because the evidence did not demonstrate that the defendants acted for the purpose of injuring the plaintiffs. *Thompson Coal*, 412 A.2d at 472. Instead, as the court explained, the evidence suggested that the defendant's actions were undertaken for a legitimate purpose. *See id.* (stating the evidence demonstrated that the defendant "acted solely to advance the legitimate business interests of his client and to advance his own interests"). The Chawla Appellants read the suggestion in *Thompson Coal* that malice was lacking because the facts did not establish that the defendant acted "solely to injure" the plaintiffs, *id.*, to mean that a defendant must know the precise identity of all the

10

defendant's victims to satisfy the "intent to injure" requirement for a civil conspiracy claim.  However, *Thompson Coal* neither expressly nor impliedly suggests that a defendant lacks the necessary intent whenever an injured party's precise identity is unknown.[9]

On the record here, the jury could fairly conclude that the Chawla Appellants acted "solely to injure" Berger and his funding sources, *id.*, because – as the Chawla Appellants acknowledge – the evidence was sufficient to show they intended to injure Berger, who appeared at the River City meeting as a representative of the Berger Entities. Indeed, the Chawla Appellants were aware that the River City meeting would be conducted with an investor group of which Berger was a member, and Berger testified

---

[9] The Chawla Appellants also rely heavily on a South Carolina case, *Future Group, II v. Nationsbank*, 478 S.E.2d 45 (S.C. 1996), in which the court held a civil conspiracy claim was improper because, among other things, there was no evidence that the defendant was aware of the plaintiff's existence.  *Id.* at 51; *see Burnside v. Abbott Labs.*, 505 A.2d 973, 981 (Pa. Super. Ct. 1985) (stating South Carolina and Pennsylvania have similar requirements for civil conspiracy claims).  The *Future Group, II* court did so, however, because the plaintiff's claim was that the defendant had conspired to impede the plaintiff's ability to recover on an investment that the defendant was not aware of. *See Future Group, II*, 478 S.E.2d at 47; *id.* at 51 ("[T]here is no evidence Bank combined with Heffron to damage 5R's by obtaining Agency's corporate guarantee since there is no evidence Bank even knew of 5R's existence in relation to Agency.").  Thus, notwithstanding the *Future Group, II* court's language concerning the defendant's awareness of a party's "existence," it was the fact that the defendant could not have foreseen the injury, not the fact the defendant was unaware of the plaintiff's existence, which was controlling.  In this case, by contrast, it was entirely foreseeable that harm would come to Berger's funding sources and *Future Group, II* is therefore distinguishable. *See, e.g.*, *PCS Nitrogen, Inc. v. Ross Dev. Corp.*, No 09-3171, 2010 WL 3893619, at *11 (D.S.C. Sept. 30, 2010) (agreeing with another district court that *Future Group, II* does not preclude a civil conspiracy claim "when the only part of the alleged harm that was unforeseeable was the identity of the people or entities that would be harmed").

11

that "it [was] understood" he was there on "behalf of … [his] companies" because it was "normal in real estate situations" to "invest[] on behalf of corporations." (App. at 1022-23.) That testimony was entirely credible, since Chawla and Weinstein were themselves acting through surrogate business entities. Given that evidence, a jury could reasonably conclude that the Chawla Appellants acted in concert with Weinstein and Pine to commit an unlawful act to injure the Berger Entities, even if the Chawla Appellants did not know the names of Berger's corporate vehicles. That finding would support a verdict in Berger's favor on his civil conspiracy claim. *See Skipworth*, 690 A.2d at 174 (civil conspiracy requires a showing that the defendants "acted in concert to commit an unlawful act or do a lawful act by unlawful means, and that they acted with malice").

Moreover, even if one accepts that the Chawla Appellants were unaware of the Berger Entities at first, a reasonable jury could determine that the Chawla Appellants had knowledge that Berger's money was coming through corporations once the first transfer from Kilbride was effectuated. Any such determination would support a finding of the requisite intent to injure, given that the Chawla Appellants thereafter undertook additional actions in furtherance of the conspiracy. It was, in fact, after the Kilbride transfer that Berger received the letter falsely suggesting that there was a bidder for 2040 Market Street's air rights and, after receiving that letter, Berger caused three separate transfers to Pine to be initiated in response to Weinstein's requests. Given the circumstances attendant to the letter's production, *see supra* note 5, the jury could have reasonably concluded that the Chawla Appellants played a role in transmitting the letter to Berger. Thus, like the evidence regarding the Chawla Appellants' initial actions in

12

courting Berger's investment at the River City meeting, the Chawla Appellants' subsequent actions also support the jury's verdict.

Accordingly, we will affirm the District Court's denial of the Chawla Appellants' motion for judgment as a matter of law.

B.    *Weinstein and Pine's Appeal*

Weinstein and Pine (collectively, the "Weinstein Appellants") argue that the District Court erred in denying their motion to alter or amend the judgment because (1) the District Court's conduct during the trial prejudiced them; (2) the January 29, 2007 letter from Weinstein's attorney to Berger was improperly admitted into evidence; and (3) the contract between Berger and Weinstein precludes Berger's tort and unjust enrichment claims. We address those arguments in turn.[10]

---

[10] The Weinstein Appellants also make two arguments that we will not address at any length. First, they, like the Chawla Appellants, contend that Berger did not introduce enough evidence to establish that the Weinstein Appellants had the intent to harm the Berger Entities. However, they never raised that argument below and, in fact, appeal from the denial of a Rule 59 motion in which sufficiency of the evidence was not, and could not have been, at issue. *Cf. Pediatrix Screening, Inc. v. TeleChem Int'l, Inc.*, 602 F.3d 541, 546 (3d Cir. 2010) (permitting a "gist of the action" challenge by way of a Rule 59 motion because, unlike the Rule 50 motion appellant had waived, the gist of the action argument did not "contest the sufficiency of the evidence underlying the … judgment"). Moreover, the sufficiency-of-the-evidence argument is plainly meritless. Second, they argue that the District Court erred by permitting Weinstein's prior counsel in an allegedly related case to represent Chawla in this case. Although the Weinstein Appellants acknowledge they never moved for counsel's disqualification or properly presented their disqualification argument to the District Court, they assert that the District Court had an independent duty to investigate and, ostensibly, disqualify Chawla's counsel because Weinstein's counsel apprised the Court of the potential conflict during a status conference. Given the Weinstein Appellants' failure to pursue this argument before filing their brief on appeal, we will not consider it. *See Tri-M Grp., LLC v. Sharp*, 638 F.3d 406, 416 (3d Cir. 2011) ("It is axiomatic that arguments asserted for the first time on appeal are deemed to be waived and consequently are not susceptible to review in this

1. *Judicial Bias*

The Weinstein Appellants argue that the conduct of the District Court violated their right to a fair trial because, they say, the Court's comments in front of the jury manifested a "clear bias" against Weinstein.[11] They ask us to vacate the District Court's judgment so as to remedy that alleged error. (Weinstein's Opening Br. at 4.)

Recognizing that "any comment by a trial judge concerning the evidence or witnesses may influence a jury considerably, and emphatic or overbearing remarks … may be accepted as controlling," *United States v. Anton*, 597 F.2d 371, 374 (3d Cir. 1979), we have set forth a series of factors to consider in determining whether a trial court's remarks "are appropriate" or, instead, whether they would "unduly influence a jury," *United States v. Olgin*, 745 F.2d 263, 268 (3d Cir. 1984). Those factors include "the materiality of the comment, its emphatic or overbearing nature, the efficacy of any curative instruction, and the prejudicial effect of the comment in light of the jury instruction as a whole." *Id.* at 268-69.

We reject the Weinstein Appellants' effort to overturn the hard work it took to manage this contentious case. The majority of the contested comments by the District

---

Court absent exceptional circumstances." (internal quotation marks and citation omitted)).

[11] Specifically, they point to the Court's statement to counsel, made in reference to 900 Delaware Avenue, that it did not want to "hear about what happened somewhere else as a figment of imagination or thought or whatever" and that "nothing in [the] exhibits … documents this scheme, plan, idea or whatever." (Supp. App. at 858-59; *see also id.* at 862 ("He already explained what the $23 million mortgage was, the rest of it … is all … a plan, a scheme, an artifice … I don't know what.").) They also identify the District Court's inquiry as to whether "someone c[a]me into [Weinstein's] office" to send the fax Weinstein disputed sending as evidence of the Court's bias. (Supp. App. at 655.)

Court were directed towards Weinstein's counsel – not Weinstein himself – and were responses to counsel's efforts to press beyond bounds the Court had set.[12] So viewed, and considering the fact that the comments comprise an exceptionally small portion of the voluminous record that this two-week trial produced, we think it evident that the District Court's comments did not have the influence the Weinstein Appellants attribute to them. *See United States v. Beaty*, 722 F.2d 1090, 1094-95 (3d Cir. 1983) ("The sheer length of this two week trial makes us cautious about investing any but the most inflammatory isolated statements with critical importance. We do not believe that a few summary questions or intemperate remarks assumed the same importance in the jury's mind as they naturally have in counsel's while preparing this appeal.").

That is particularly clear in light of the District Court's repeated instruction that jury members should form their own conclusions and not rely on anything the Court might have said in the course of managing the proceedings. (*See, e.g.*, Supp. App. at 1115 (instructing jurors that they should "not rely upon any impressions that [they] have as to the Court's view of the facts in this case").) Jurors are, after all, presumed to follow a court's instructions, *see United States v. Vaulin*, 132 F.3d 898, 901 (3d Cir. 1997), and an instruction explaining that the jury is "free to disregard [the court's] remarks and …

---

[12] While the record is not entirely clear, we understand the District Court to have been trying to limit unsupported hearsay that Weinstein's counsel repeatedly attempted to put before the jury. Those discussions with counsel, which at times bore the tone of rebuke, should have taken place at sidebar, since counsel for both parties strayed into argument and the Court's impatience became evident. While the refusal to accommodate the request by Weinstein's counsel to approach the bench was, we think, ill-advised, it does not amount to reversible error on this record.

15

determine the facts … on its own" may therefore counterbalance a potentially prejudicial comment, *Olgin*, 745 F.2d at 269. We are satisfied that, in this case, the District Court's instruction did just that.

In sum, considering the nature of the comments made, the sparse number of comments the Weinstein Appellants take exception to, and the District Court's jury instructions, we conclude that the District Court's conduct during trial did not influence the verdict.

### 2. *Admission of the Fax*

The Weinstein Appellants next argue that the District Court erred in admitting the January 29, 2007 letter from Weinstein's attorney and the accompanying checks, because they were improperly authenticated as having been sent from Weinstein. We review that evidentiary determination for an abuse of discretion. *See United States v. Reilly*, 33 F.3d 1396, 1403 (3d Cir. 1994).

Federal Rule of Evidence 901(a) requires a proponent of evidence to "produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). That burden is "slight," requiring only sufficient evidence from which "the fact-finder could legitimately infer that the evidence is what the proponent claims it to be." *Reilly*, 33 F.3d at 1425 (citation omitted). The Weinstein Appellants argue that Berger failed to properly authenticate the letter and checks because Berger lacked personal knowledge as to whether those materials were sent from Weinstein, and offered no testimony or evidence that could properly demonstrate that Weinstein had sent them. However, in light of Berger's testimony that he believed the letter and checks were

16

from Weinstein due to a fax header stating that some of the materials had been sent by Pine,[13] and the fact that the letter relayed information in connection with a meeting that had taken place the day before, it can hardly be said that the District Court abused its discretion in concluding that Berger had met his burden of providing sufficient grounds for a jury to rationally attribute the letter to Weinstein. *See id.* at 1425; *id.* at 1407 ("A letter … may be authenticated by its contents with or without the aid of physical characteristics if the letter is shown to contain information that persons other than the purported sender are not likely to possess." (internal quotation marks and citation omitted)).

Accordingly, the District Court did not err in admitting the January 29, 2007 letter and checks into evidence.[14]

---

[13] Although Weinstein contested sending the fax, he acknowledged that it was sent from his office. When asked whether the checks were sent to Berger from his office, he testified "[s]omeone in my office, according to the fax that I've seen … someone in my office used my fax machine and sent that, that's correct." (Supp. App. at 654-55.)

[14] The Weinstein Appellants alternatively argue that the letter admitted was an improper "duplicate" of the real letter, *see* Fed. R. Evid. 1003 ("A duplicate is admissible to the same extent as the original unless a genuine question is raised about the original's authenticity or the circumstances make it unfair to admit the duplicate."), inasmuch as it did not contain the cover sheet that Weinstein testified would have been included with the letter. That argument fails, however, because Weinstein never produced any such cover sheet or otherwise demonstrated that one ever existed. *See supra* note 6.

### 3. *The Jury's Finding of a Contract Between the Parties*

Finally, the Weinstein Appellants argue that the jury's finding that Weinstein and Berger entered into a contract bars Berger's tort and unjust enrichment claims. We exercise plenary review of those contentions. *See generally Pediatrix Screening, Inc. v. TeleChem Int'l, Inc.*, 602 F.3d 541, 547-48 (3d Cir. 2010) (permitting appellate review of a "gist of the action" challenge presented under Rule 59, observing that the defendant "does not now contest the sufficiency of the evidence … but the legal ruling allowing tort recovery for conduct that arguably was a breach of contract").

According to the Weinstein Appellants, Berger's tort claims are barred under the "gist of the action" doctrine, which "precludes plaintiffs from re-casting ordinary breach of contract claims into tort claims." *Id.* at 548 (internal quotation marks omitted) (quoting *eToll, Inc. v. Elias/Savion Adver., Inc.*, 811 A.2d 10, 14 (Pa. Super. Ct. 2002)). However, notwithstanding the Weinstein Appellants' suggestion that the gist of the action doctrine bars any tort claims whenever there is a contract between the parties, the doctrine has no application when the contractual relationship is collateral to the tortious conduct. *eToll, Inc.*, 811 A.2d at 14, 17. It is plain, for example, that it does not bar tort claims that arise from the "fraudulent inducement to enter into a contract." *Sullivan v. Chartwell Inv. Partners, LP*, 873 A.2d 710, 719 (Pa. Super. Ct. 2005); *see id.* ("[S]ince Appellant's tort claims relate to the inducement to contract, they are collateral to the performance of the contracts and therefore, are not barred by the gist-of-the action doctrine.").

18

That point is dispositive in this case because, as the District Court appropriately recognized, the evidence presented at trial could have been interpreted to establish that there would have been no contract between Weinstein and Berger absent Weinstein's actions in inducing Berger to invest in the two projects. *See Intermilo, Inc. v. I.P. Enters., Inc.*, 19 F.3d 890, 892 (3d Cir. 1994) (stating that, after a jury trial, facts are reviewed to "'determine whether the evidence and justifiable inferences most favorable to the prevailing party afford any rational basis for the verdict'" (quoting *Bhaya v. Westinghouse Elec. Corp.*, 832 F.2d 258, 259 (3d Cir. 1987))). A rational conclusion from the evidence is that Berger's decisions to invest money from the Berger Entities with Weinstein were made only after Berger was misled regarding the River City and 2040 Market Street projects. As a result, the jury's finding that there was a contract does not preclude Berger's tort claims under the gist of the action doctrine.

Nor does the parties' contract preclude a verdict in Berger's favor on his unjust enrichment claim. Although an unjust enrichment claim is "inapplicable where a written or express contract exists," *Lackner v. Glosser*, 892 A.2d 21, 34 (Pa. Super. 2006), that is only true, as the Weinstein Appellants acknowledge, when the express contract is "on the same subject," *Matter of Penn Cen. Transp. Co.*, 831 F.2d 1221, 1230 (3d Cir. 1987); *see also Hershey Foods Corp. v. Ralph Chapek, Inc.*, 828 F.2d 989, 999 (3d Cir. 1987) ("Under Pennsylvania law … . [w]here an express contract governs the relationship of the parties, a party's recovery is limited to the measure provided in the express contract."). Here, as the District Court observed, Weinstein and Berger both testified that they arranged for Berger to invest $21.5 million for the two properties. (*See* Supp. App.

19

at 643 (Weinstein's testimony that "around the middle of December, 2006, … Berger provided $21.5 million to purchase both River City and 2040 Market Street"); App. at 894 (Berger's testimony that $12 million was sent to close on River City); App. at 897 (Berger's testimony that $9.5 million was sent to close on 2040 Market Street).) Berger, however, caused the Berger Entities to invest a total of $36.5 million in the two properties. Based on that evidence, the jury could have concluded that the contract between the parties involved only $21.5 million, meaning that Berger's unjust enrichment claim could permit him to recover, at a minimum, the $15 million difference between what was covered by his contractual arrangement with Weinstein and the amount he caused the Berger Entities to invest. *See Intermilo*, 19 F.3d at 892.

Thus, the District Court properly rejected the Weinstein Appellants' contention that the contractual relationship between Weinstein and Berger barred Berger's other claims.

## III.    Conclusion

For the foregoing reasons, we will affirm the judgment and the District Court's orders denying the defendants' post-judgment motions.[15]

---

[15] The Weinstein Appellants have moved to strike Berger's brief on the ground that it contains a false representation in a footnote that, evidently, they believed would inhibit our ability to objectively evaluate the merits of their appeal. We reject the implication, and will deny that motion in a separate order.