IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Atlantic Richfield Company, E.I. du : 
Pont de Nemours and Company, NL : 
Industries, Inc., PPG Industries, Inc., : 
and The Sherwin-Williams Company, : 
               Appellants : 
               : 
       v. :    No. 1338 C.D. 2021
               : 
The County of Montgomery, : 
Pennsylvania :    Argued: December 14, 2022

BEFORE:    HONORABLE RENÉE COHN JUBELIRER, President Judge
                HONORABLE PATRICIA A. McCULLOUGH, Judge
                HONORABLE MICHAEL H. WOJCIK, Judge
                HONORABLE CHRISTINE FIZZANO CANNON, Judge
                HONORABLE ELLEN CEISLER, Judge
                HONORABLE LORI A. DUMAS, Judge

OPINION BY JUDGE CEISLER               FILED: May 5, 2023

      Atlantic Richfield Company, E.I. du Pont de Nemours and Company, NL Industries, Inc., PPG Industries, Inc., and The Sherwin-Williams Company (together, Manufacturers) appeal from the October 15, 2021 Order of the Court of Common Pleas of Montgomery County (Trial Court) overruling their Preliminary Objections to the County of Montgomery's (County) Second Amended Complaint in this public nuisance action. In its Second Amended Complaint, the County seeks a declaratory judgment that lead paint is a public nuisance under the common law as well as the Lead Certification Act (Certification Act), Act of July 6, 1995, P.L. 291, No. 44, 35 P.S. §§ 5901-5916. On appeal, the Manufacturers argue that the County's proposed interpretation of the Certification Act is contrary to its plain language and legislative intent and that the County has failed to establish proximate causation under Pennsylvania tort law. Upon review, we reverse the Trial Court's Order and

remand to the Trial Court for the entry of an order dismissing the Second Amended Complaint.

## I. Background

The Manufacturers are businesses that "manufactured, sold, distributed, and/or promoted" paints or pigments for household use between 1880 and 1977, or are the successors-in-interest to such businesses. Original Record (O.R.), Item No. 4, Second Am. Compl. ¶¶ 13, 18, 22, 28, 32. During that period, lead was a prevalent ingredient in many types of paints intended and sold for exterior and interior residential use. *Id.* ¶ 35. The use of lead paint is associated with various health hazards that have been widely known for centuries. *Id.* However, the Manufacturers continued to market lead paint in ways that omitted or obfuscated these health hazards. *Id.* ¶ 94.

The danger of lead paint arises from its tendency to erode over time into chips, flakes, and dust, which are then deposited on floors, windows, and other inside surfaces. *Id.* ¶ 36. Because children normally engage in "hand-to-mouth" behavior as part of their physical and mental development, they are particularly vulnerable to such sources of contamination. *Id.* ¶ 37. Exacerbating the danger is the especially hazardous effect of lead on children; exposure can lead to devastating and permanent mental injuries. *Id.* ¶ 38. Beyond the individual health consequences, lead poisoning creates a cumulative, deleterious effect on whole communities by depriving them of well-adjusted, happy, and productive citizens. *Id.* ¶ 44. Because of its dangers, the federal government banned the manufacture and sale of lead paint in 1978. *Id.* ¶ 46. Leading experts agree, however, that deteriorating lead paint continues to be the primary source of lead poisoning in young children today. *Id.* ¶ 46.

2

With a population of approximately 800,000 people, the County is the third-most populous in Pennsylvania. *Id.* ¶ 7. The County estimates that 211,402 of its residential structures, or 64.9% of the total, were built before lead paint was banned and, therefore, may be "contaminated by lead paint." *Id.* ¶¶ 9,10. However, the risks of lead exposure are particularly serious in rental housing inhabited by low-income families, where painted surfaces tend to be poorly maintained. *See id.* ¶¶ 51-52. Using United States Census data, the County estimates that at least 4,512 of its residential structures are "in critical and immediate need of abatement to address the risks posed by lead paint hazards." *Id.* ¶ 53.

The County initiated this action by filing a Complaint in the Trial Court on October 4, 2018.[1] *See* O.R., Item No. 0. The Complaint consisted of two counts. The first was a common law public nuisance claim, in which the County asserted that the continued presence of lead paint in County residences "pose[s] a past, present, and ongoing risk of lead poisoning" to their inhabitants, particularly children. *Id.* ¶ 123. The County maintained that the Manufacturers' conduct "is a direct, legal, and proximate cause of [a] public nuisance currently afflicting the County and its citizens." *Id.* ¶ 127. The second count sought a declaratory judgment that Section 2(a) of the Certification Act[2] "explicitly and/or implicitly identified"

---

[1] On October 12, 2018, the County of Lehigh also filed an action in the Court of Common Pleas of Lehigh County, in which it made substantially the same allegations, and sought substantially the same relief, as the County in the instant matter. The County of Lehigh action is the basis of a separate appeal before this Court. *See Atl. Richfield Co. v. Lehigh County* (Pa. Cmwlth., No. 1260 C.D. 2021, filed May 5, 2023) (*Lehigh County*).

[2] Section 2(a) of the Certification Act provides:

**(a) Findings.--**The General Assembly finds as follows:

**(Footnote continued on next page…)**

3

lead-based paint as a public nuisance. *Id.* ¶ 133. As a proposed remedy, the County called for the cost of abatement of lead paint "throughout the County," among other damages. *See id.* ¶ 130. The County filed an Amended Complaint on October 18, 2018, in which it made only minor changes to the original Complaint. *See* O.R., Item No. 1.

On November 6, 2018, the County filed a Second Amended Complaint, which is the operative complaint at issue in this appeal. *See* O.R., Item No. 4, Second Am. Compl. It included a single count, in which the County again alleged that lead paint "constitute[s] a public nuisance under the common law of Pennsylvania." *Id.* ¶ 123. The County also reiterated its assertion that Section 2(a) declares lead paint a public nuisance. *Id.* ¶ 124. It further argued that it had the power to bring suit against the Manufacturers pursuant to Section 2(a). *Id.* ¶ 133. As a remedy, the County proposed a declaratory judgment that lead paint is a public nuisance, plus an award of the cost of abating affected properties, and other damages, which the County referred to as "supplemental relief." *Id.* ¶ 134.

---

(1) Lead poisoning is a significant health hazard to the citizens of this Commonwealth. Lead poisoning is particularly a hazard to children who typically are exposed to lead through environmental sources such as lead-based paint in housing and lead-contaminated dust and soil. It is the policy of this Commonwealth to protect the health and welfare of its citizens through reduction of lead in the environment.

(2) Improper abatement of lead-based paint within this Commonwealth constitutes a serious threat to the public health and safety and to the environment. The handling of lead-containing substances by inadequately trained employers, employees and other persons subjects the citizens of this Commonwealth to the risk of further release of lead into the environment.

35 P.S. § 5902(a).

4

The Manufacturers filed their Preliminary Objections to the Second Amended Complaint on December 21, 2020. *See* O.R., Item No. 38, POs. Their first objection, in the nature of a demurrer, asserts that the County's claim fails to satisfy the necessary elements of common law public nuisance. *Id.* ¶ 5. Specifically, the Manufacturers argue that a public nuisance plaintiff must allege that the defendant maintained control over the nuisance, that the defendant's conduct interfered with a "right common to all members of the public," and that the conduct was the proximate cause of the alleged injuries. *See id.* ¶¶ 6, 8. The Manufacturers further assert that the County did not sufficiently allege causation, since it was the poor maintenance of existing lead paint, in the decades since any of the Manufacturers last sold lead paint, which is the proximate cause of the injuries. *Id.* ¶ 9. Furthermore, the Manufacturers assert, the County only alleged private, personal injuries, rather than any interference with a public right. *Id.* ¶ 8.

The Manufacturers' second objection, also in the nature of a demurrer, asserts that the County's allegations lacked any support in the Certification Act. *Id.* ¶ 12. The Manufacturers explained that the legislation "regulates the training, certification and performance of persons engaged in lead abatement," not the manufacture of lead paint. *Id.* ¶ 13 (citing Section 2(a) of the Certification Act, 35 P.S. § 5902(a)(2)). The Manufacturers additionally argue that the Certification Act does not declare a public nuisance of any sort, does not authorize legal action unless its provisions have been violated, and grants the Department of Labor and Industry (Department) the exclusive authority to enforce those provisions.[3] *Id.* ¶ 15.

---

[3] The Manufacturers also asserted that the County failed to join necessary parties pursuant to Pennsylvania Rule of Civil Procedure 1028(a)(5), Pa.R.Civ.P. 1028(a)(5). Specifically, the Manufacturers argued that the County should have joined the individual property owners, since

**(Footnote continued on next page…)**

In opposition to the Preliminary Objections, the County clarified that it sought "declaratory relief *only* on the basis of [the Certification Act, which] focused entirely and specifically on the hazards of lead paint." O.R., Item No. 66, County's Memorandum (Mem.) of Law at 1 (emphasis added). In enacting the Certification Act, the County argued, the General Assembly declared that "lead paint is, in and of itself, always and everywhere a health hazard." *Id.* at 28. Accordingly, the County explains, "Pennsylvania state law is clear: lead paint is illegal in Pennsylvania, always and everywhere." *Id.* at 27. The County maintained, however, that it satisfied the elements of a common law public nuisance claim. *See generally id.* at 9-23.

On October 15, 2021, the Trial Court overruled the Manufacturers' Preliminary Objections. *See* O.R., Item No. 100. The Trial Court explained that its decision was "made difficult by the paucity of Pennsylvania appellate opinions directly on point." *Id.* The Trial Court further noted that two other public nuisance claims against manufacturers of allegedly dangerous products, including *Lehigh County*, had recently been permitted to proceed at the trial court stage. *Id.* Given those recent decisions, "the absence of appellate authority directly on point," and the principle that preliminary objections should only be sustained in cases that are free and clear from all doubt, the Trial Court concluded that the Manufacturers' Preliminary Objections should be overruled. *Id.*

The Manufacturers filed a motion with the Trial Court seeking permission to file an interlocutory appeal, which the Trial Court granted and certified its order pursuant to 42 Pa.C.S. § 702(b). *See* O.R., Item No. 105. On February 18, 2022,

---

the remedies sought "would subject [them] to potential criminal and civil liability." O.R., Item No. 38, POs ¶ 16. However, that issue is not one of the issues on which this Court granted permission to appeal.

this Court entered an Order granting the Manufacturers' petition for permission to appeal the Trial Court's order. We limited the issues on appeal to the following:

> Does the Supreme Court's decision in *Skipworth v. Lead Indus*[*tries*] *Ass*[*ociation*], 690 A.2d 169 (Pa. 1997), apply to a public nuisance claim and require dismissal because the County does not "identify the manufacturer of any of the lead pigment" allegedly at any property that is part of the alleged public nuisance?
>
> Does the . . . Certification Act[] . . . preclude the County's public nuisance claim where the statute permits residential lead paint in a "lead-safe" condition and does not declare all lead paint in housing to be a public nuisance?
>
> Is the County's claim a misuse of the Declaratory Judgment[s] Act[, 42 Pa. C.S. §§ 7531-7541,] where the County has failed to join the owners whose private properties are at issue, and where the County is advancing novel theories of liability that seek to change Pennsylvania law?

O.R., Item No. 116.

## II. Issues

The Manufacturers argue that the Certification Act does not support a claim that the mere presence of lead paint is a public nuisance. According to the Manufacturers, such an interpretation is contrary to the Certification Act's plain language, broad structure, history, and application. The Manufacturers further argue that if this Court considers the County's common law nuisance claim, the County failed to identify the Manufacturers on a property-by-property basis, as is required to establish causation. Finally, the Manufacturers argue that the County is misusing the Declaratory Judgments Act in an effort to overturn existing law. Consequently, the Manufacturers argue that the Trial Court erred as a matter of law in overruling their Preliminary Objections.

7

## III. Discussion

Our scope of review of a trial court's ruling on preliminary objections is limited to a determination of whether the trial court abused its discretion or committed an error of law. *Leahy v. Pa. Liquor Control Bd.*, 551 A.2d 1153, 1156 (Pa. Cmwlth. 1988). Preliminary objections are to be sustained only in cases where the pleader has clearly failed to state a claim for which relief can be granted. *Torres v. Beard*, 997 A.2d 1242, 1245 (Pa. Cmwlth. 2010). Where a preliminary objection presents a question of law, our standard of review is *de novo* and our scope of review is plenary. *Firearm Owners Against Crime v. City of Harrisburg*, 218 A.3d 497, 505 (Pa. Cmwlth. 2019).

### A. Lead Paint as a Public Nuisance Pursuant to the Certification Act

The Manufacturers argue that the Certification Act does not declare, in any fashion, the presence of lead paint to be a public nuisance. O.R., Item No. 35, Manufacturers' Preliminary Objections (POs) ¶ 12. Rather, they argue, the Certification Act is solely concerned with "the training, certification, and performance of persons engaged in lead abatement." *Id.* ¶ 13. According to the Manufacturers, the Certification Act's findings state only that lead *poisoning*, not lead paint, is a health hazard, and that improper abatement poses a threat to public health. *Id.* ¶ 14. Furthermore, the Manufacturers argue, the Certification Act grants exclusive enforcement authority to the Department, and even then, only for violations of the Certification Act, which the County did not allege. *Id.* ¶ 15. Thus, the Manufacturers argue that the Trial Court improperly overruled their Preliminary Objection to the County's statutory public nuisance claim.

A brief summary of the Certification Act's historical background aids in clarifying its purpose. In 1992, the United States Congress enacted the Residential

Lead-Based Paint Hazard Reduction Act of 1992, 42 U.S.C. §§ 4851-4856 (Hazard Reduction Act). The legislation was enacted with the purpose of "radically alter[ing] the federal paradigm for identifying and treating lead-based paint hazards" by "targeting federal efforts to the reduction and elimination of actual, not potential hazards, and by permitting interim hazard reduction measures, rather than full hazard elimination." S. Rep. No. 102-332, at 111 (1992). One of the Hazard Reduction Act's measures was the provision of up to $250 million in federal grants "to assist cities and states in addressing the enormous lead paint poisoning risks posed by private low income housing." *Id.* at 115. To be eligible, a state was required to develop and obtain federal approval of its own lead-reduction program. *See* 15 U.S.C. § 2684(a)-(g).

Just minutes before the Pennsylvania House of Representatives passed the Certification Act unanimously in 1995, the legislation's sponsor explained that it was drafted to "fulfill the requirements contained in the . . . Hazard Reduction Act . . . , which stipulates that States must develop programs for the certification of lead-based paint workers and the accreditation of lead-based paint training providers." Legislative Journal–House, June 21, 1995, at 1628.[4] Urging passage, the sponsor explained that the legislation would "allow Pennsylvania to draw down millions of dollars in federal funds to assist in lead abatement work." *Id.*

In Section 2(a)(1) of the Certification Act, the General Assembly cited two key findings as the basis for the legislation: first, that lead poisoning had become "a significant health hazard to the citizens of this Commonwealth"; and second, that "[i]mproper abatement of lead-based paint within this Commonwealth constitutes a

---

[4] While intent cannot be conclusively determined from legislative remarks, this Court may review legislative policy reasons expressed in the House and Senate journals as an aid in construction. *Young v. Ins. Dep't*, 604 A.2d 1105, 1108 n.8 (Pa. Cmwlth. 1992).

9

serious threat to the public health and safety and to the environment." 35 P.S. § 5902(a)(1). More specifically, the "handling of lead-containing substances by inadequately trained employers, employees and other persons subjects the citizens of this Commonwealth to the risk of further release of lead into the environment." Section 2(a)(2) of the Certification Act, 35 P.S. § 5902(a)(2).

The General Assembly's stated intent in enacting the Certification Act is to address the above concerns "by preventing exposure to lead through regulation of lead-based paint activities"; by "establish[ing] a program to train individuals engaged in lead-based paint activities to insure they have the necessary skill, training, experience and competence to perform" them; by "monitor[ing] the work practices of those persons performing lead-based paint activities"; and by "insur[ing] that the cleanup, disposal and post[-]abatement clearance testing activities of persons performing lead-based paint activities are performed in accordance with required standards." Section 2(b)(1)-(4) of the Certification Act, 35 P.S. § 5902(b)(1)-(4). "Lead-based paint activities" is defined as "risk assessment, inspection, and abatement." Section 3 of the Certification Act, 35 P.S. § 5903. In turn, "abatement" includes "[l]ess-than-full abatement whereby the sources of lead contamination are reduced sufficiently to create *a 'lead-safe' environment rather than a 'lead-free' environment*." *Id.* (emphasis added). In furtherance of its aims, the Certification Act empowers the Department "to issue an order requiring compliance with this [A]ct or regulations promulgated under this [A]ct." Section 10(a) of the Certification Act, 35 P.S. § 5910(a).

Instantly, the County avers that in Section 2 of the Certification Act, the General Assembly "has explicitly and/or implicitly declared that lead paint is a public nuisance." O.R., Item No. 19, Second Am. Compl. ¶ 124. The County further

10

claims that it has brought the instant action pursuant to Section 2, which empowers the County to "enforce the public rights of its citizenry." *Id.* ¶ 125. Additionally, the County explains that it derives this power from Section 10(d)(4), which, in the County's view, authorizes the "initiation of legal action or proceeding in a court of competent jurisdiction" for violations of a regulation promulgated under the Certification Act. *Id.* (citing 35 P.S. § 5910(d)(4)).

We begin our analysis by rejecting the County's contention that the Certification Act "explicitly" declares anything to be a public nuisance. Such a declaration would be self-evident through the use of clear legislative language. *See, e.g.*, Act of June 23, 1931, P.L. 1178, No. 319, 68 P.S. § 467 (providing that "any building, or part of a building, used for the purpose of fornication, lewdness, assignation, and/or prostitution *is hereby declared to be a common nuisance*"); Section 3 of the Clean Streams Law,[5] 35 P.S. § 691.3 (providing that the pollution of Commonwealth waters "is hereby declared not to be a reasonable or natural use of such waters, to be against public policy *and to be a public nuisance*") (emphases added). The Certification Act, by contrast, does not contain a single occurrence of the word "nuisance."

Next, we consider the argument that the General Assembly "implicitly" declared lead paint to be a public nuisance. Our courts have, on occasion, determined certain conduct to be a public nuisance "because it is so declared by statute . . . implicitly." *Com. v. MacDonald*, 347 A.2d 290, 303 (Pa. 1975). In *Pennsylvania Society for Prevention of Cruelty to Animals v. Bravo Enterprises, Inc.*, 237 A.2d 342, 360 (Pa. 1968), for example, our Supreme Court reasoned that a statute outlawing bullfighting "is declarative of the public policy and is tantamount

---

[5] Act of June 22, 1937, P.L. 1987, *as amended*, 35 P.S. §§ 691.1-691.1001.

11

to calling the proscribed matter prejudicial to the interests of the public." Reasoning that "[i]njury to the public is the essence of a public nuisance," the Court concluded that bullfighting is "properly enjoinable as being contrary to law and prejudicial to the interests of the public." *Id.* In other words, the statute's *prohibition of the underlying conduct* was a necessary condition to the determination that the statute implicitly declared that conduct to be a public nuisance. *See also MacDonald*, 347 A.2d at 290 n.30 (explaining that *Bravo Enterprises* stands for the proposition that "bullfighting is [a] public nuisance because [it is] proscribed by statute"); *Phila. Chewing Gum Corp. v. Dep't of Env't Res.*, 387 A.2d 142, 150 n.5 (Pa. Cmwlth. 1978) (determining that conduct prohibited by Section 316 of the Clean Streams Law, 35 P.S. § 691.316, "constitutes an implicitly declared statutory public nuisance"), *aff'd in part, rev'd in part*, *Natural Wood Preservers, Inc. v. Dep't of Env't Res.*, 414 A.2d 37 (Pa. 1980).

The Certification Act stands in stark contrast to other statutes that our courts have interpreted to implicitly declare public nuisances. There is nothing in the Certification Act that retroactively proscribes the past manufacture and sale of lead paint, which is the only conduct the Second Amended Complaint attributes to the Manufacturers. Indeed, the Certification Act's stated intent, its plain language, its drafting history, and its mechanisms of enforcement all indicate that the legislation was enacted to address the dangers posed by the *improper abatement* of lead paint. We conclude that, contrary to the County's assertions, the Certification Act does not declare, explicitly or implicitly, that all lead paint is a public nuisance. Indeed, Section 3 specifically provides that proper abatement may create a "'lead-safe' environment" rather than one that is "'lead-free.'" 35 P.S. § 5903.

12

In addition, the County misinterprets the Certification Act's enforcement provisions. It is true that Section 10(d)(4) provides that "a person who fails to comply with a requirement of this act or a regulation promulgated under this act or who fails to obey an order issued by the [D]epartment may be subject to . . . initiation of legal action or proceeding in a court of competent jurisdiction." 35 P.S. § 5910(d)(4). However, the preceding subsections of Section 10 grant only the Department the power of enforcement.[6] *See* 35 P.S. § 5910(b) (authorizing the Department to "issue an order requiring compliance with this act or regulations promulgated under this [A]ct"); *id.* § 5910(c) (authorizing additional remedies if "the [D]epartment determines that a hazardous condition exists due to the failure to comply with a provision of this act or a regulation promulgated under this [A]ct"); *id.* § 5910(d)(1) (authorizing the "[d]enial, suspension or revocation of accreditation for a person, training provider or contractor"). Section 10(d)(4) therefore cannot be reasonably interpreted to empower political subdivisions to take action against alleged violators of the Certification Act or its accompanying regulations. Even if such a broad interpretation were warranted, the County has not alleged that any Manufacturer violated a Certification Act regulation.

We conclude that Section 2 of the Certification Act does not declare lead paint to be a public nuisance. Section 10 of the Certification Act also does not empower the County or other political subdivisions to enforce its provisions, and even if it did, the Second Amended Complaint fails to identify which provision the Manufacturers allegedly violated. Accordingly, we conclude that the Second Amended Complaint fails to state a cause of action for public nuisance under the Certification Act.

---

[6] In interpreting Section 10(d)(4) of the Certification Act, we are mindful that "a court should not interpret statutory words in isolation, but must read them with reference to the context in which they appear." *Roethlein v. Portnoff Law Assocs.*, 81 A.3d 816, 822 (Pa. 2013).

13

## B. Lead Paint as a Public Nuisance Pursuant to the Common Law

### 1. Public Right

Next, the Manufacturers argue that the Second Amended Complaint "fails to allege the interference with a public right"; rather, it alleges "a risk of personal injury from lead paint to individuals within privately owned—not [publicly] accessible residences." O.R., Item No. 35, POs ¶ 8.

Section 821B of the Restatement (Second) of Torts (Am. Law Inst. 1965) (Restatement (2nd)), on which Pennsylvania courts rely in public nuisance actions,[7] provides:

> (1) A public nuisance is an unreasonable interference with a right common to the general public.
>
> (2) Circumstances that may sustain a holding that an interference with a public right is unreasonable include the following:
>
>> (a) whether the conduct involves a significant interference with the public health, the public safety, the public peace, the public comfort or the public convenience, or
>>
>> (b) whether the conduct is proscribed by a statute, ordinance or administrative regulation, or
>>
>> (c) whether the conduct is of a continuing nature or has produced
>> a permanent or long-lasting effect, and, as the actor knows or has reason to know, has a significant effect upon the public right.

Restatement (2nd) § 821B.

Unlike reasonableness, which is a factual inquiry, whether a right is *public* is a question of law. *Machipongo Land & Coal Co. v. Com.*, 799 A.2d 751, 773 (Pa. 2002). In the context of public nuisance claims, a public right is necessarily

---

[7] The Restatement (Third) of Torts (Am. Law Inst. 1998) was published in 1998; however, Pennsylvania remains a Second Restatement jurisdiction until the courts adopt the Third Restatement definition. *Com. v. Monsanto*, 269 A.3d 623, 648 n.18 (Pa. Cmwlth. 2021).

collective in nature. Restatement (2nd) § 821B cmt. g. It is not like an individual's right to be free from assault or defamation, fraud, or injury by negligent actions of others. *Id.*; *see also Blue Mountain Pres. Ass'n v. Twp. of Eldred*, 867 A.2d 692, 704 (Pa. Cmwlth. 2005) (explaining that a public nuisance "affects the general public," rather than "merely some private individual or individuals") (citing *Groff v. Borough of Sellersville*, 314 A.2d 328, 330 (Pa. Cmwlth. 1974)).

Because the rights affected by a public nuisance are collective, the nuisance "produces no greater injury to one person than to another." *Twp. of Eldred*, 867 A.2d at 704; *see also Greyhound Lines, Inc. v. Peter Pan Bus Lines, Inc.*, 845 F. Supp. 295, 302 (E.D. Pa. 1994) (explaining that, under Pennsylvania tort law, "the law of public nuisance comprehends threats to the public at large, not specific persons"). The Second Restatement gives the hypothetical example of pollution in a stream, which, if it "deprives fifty or a hundred lower riparian owners of the use of the water for purposes connected with their land," is not a public nuisance. Restatement (2nd) § 821B cmt. g. "If, however, the pollution prevents the use of a public bathing beach or kills the fish in a navigable stream and so deprives *all members of the community* of the right to fish, it becomes a public nuisance." *Id.* (emphasis added).

Instantly, the County argues that its citizens have "a common right to be free from the detrimental effects of exposure to lead paints/pigments in, on, and around private homes and residences throughout the County." O.R., Item No. 19, Second Am. Compl. ¶ 123. Because the Manufacturers' conduct has "significantly and materially" interfered with such rights, and continues to do so, the County alleges, they are liable for public nuisance. *Id.* The County further explains that public nuisances need not only impact "public space[s]" or "shared[,] indivisible

15

resource[s]," but private dwellings as well.  O.R., Item No. 60, County's Mem. of Law at 13.  In support, the County cites this Court's decision in *Feeley v. Borough of Ridley Park*, 551 A.2d 373 (Pa. Cmwlth. 1988).  In that case, we affirmed a lower court's finding that a homeowner's "deplorable state of disrepair, lacking proper plumbing, electricity, or water," in addition to her failure to care properly for her many household cats, constituted a public nuisance.  *Id.* at 375.  If, the County argues, this Court could determine that conduct with such a limited impact could be a public nuisance, then "the poisonous and decaying paint on tens of thousands of walls of the County's homes . . . would also qualify."  County's Mem. of Law at 14.

While it is true that public nuisances may occur on private property, the rights that are adversely impacted must still be "collective in nature."  Restatement (2nd) § 821B cmt. g.  The purported rights in the Second Amended Complaint, by contrast, are akin to the individual rights "not to be assaulted or defamed or defrauded or negligently injured," which cannot give rise to public nuisance actions.  The distinction between public and individual rights still holds even in instances where the individual rights of a large number of persons have been affected.  In contrast to public nuisances,

> [t]he manufacture and distribution of products rarely, if ever, causes a violation of a public right as that term has been understood in the law of public nuisance . . . . Even if the owners of a fast-food chain were to sell millions of defectively produced hamburgers causing harm to millions of people who ate them, the violation of rights is a series of separate violations of private rights—typical tort or contract rights that the consumers might have—not a violation of the rights of the general public, or of the public as the public. *The sheer number of violations does not transform the harm from individual injury to communal injury.*

Donald G. Gifford, *Public Nuisance as a Mass Products Liability Tort*, 71 U. Cin. L. Rev., 741, 817 (2003) (emphasis added).

16

For these reasons, we also conclude that *Feeley* is inapposite here. In that case, the alleged nuisance consisted entirely of "noxious and overpowering odors emanating from [the defendant's] home." 551 A.2d at 375. Neighbors testified that the odors "forced [them] to keep their windows closed." *Id.* Residents who lived "down the block and around the corner" were also affected. *Id.* In other words, it was the collective interest in the neighborhood's clean air that was impacted, not merely the accumulation of various injuries to individual property rights. The injury was therefore more akin to the pollution of a stream, which deprives the entire community of the right to fish, than to the injuries alleged by the County. Furthermore, the plaintiff in *Feeley* did not allege that the defendant's conduct impacted only some neighborhood residents, or impacted some residents substantially more than others. This case is therefore distinguishable from *Feeley* in that one dwelling may be adversely impacted by lead paint, while others nearby may not be impacted at all. Such individual injuries are distinct from a public nuisance, which "produces no greater injury to one person than to another." *Twp. of Eldred*, 867 A.2d at 704.

## 2. Causation

Next, the Manufacturers maintain that the Trial Court erred in overruling their Preliminary Objections because the County has failed to satisfy Pennsylvania tort law's "fundamental causation requirement." Manufacturers' Br. at 32. Specifically, the Manufacturers explain that "in order to establish a viable claim for abatement of lead paint and pigment, a plaintiff must allege on a property-by-property basis that lead paint or pigment manufactured by a particular identified defendant is present today and causing harm at a particular property." *Id.* at 31-32.

17

The Manufacturers further argue that the County "is trying to bring the same claim" as the one brought by the unsuccessful plaintiffs in *Skipworth*. Manufacturers' Br. at 34. In that case, the child plaintiff had been hospitalized for lead poisoning after ingesting lead paint in her legal guardian's home, which was built circa 1870. *Skipworth*, 690 A.2d at 170-71. The guardian and mother filed a products liability action against several paint manufacturers. *Id.* at 171. Admittedly unable to identify the specific manufacturer that made the lead paint used in the guardian's home, the plaintiffs "proceeded against the [defendants] by invoking theories of collective liability." *Id.* The trial court granted summary judgment on all counts and the Superior Court affirmed, explaining such alternative liability theories have not been adopted into Pennsylvania law. *See Skipworth by Williams v. Lead Indus. Ass'n, Inc.*, 665 A.2d 1288, 1291 (Pa. Super. 1995), *aff'd*, 690 A.2d 169.

On appeal, the primary question before the Supreme Court was whether the Court "should adopt the market share liability theory in the context of lead poisoning cases." *Skipworth*, 690 A.2d at 171. Describing market share liability as "an exception to the general rule that a plaintiff must establish that the defendant proximately caused his or her injury," the Court compared the matter *sub judice* to the seminal case on market share liability, *Sindell v. Abbott Laboratories*, 607 P.2d 924 (Cal. 1980).[8] The Court acknowledged the possibility of a situation, such as in

---

[8] In *Sindell*, the plaintiff suffered severe health complications allegedly caused by diethylstilbestrol (DES), a medicine once prescribed to prevent miscarriages, taken by her mother before the plaintiff's birth. 607 P.2d at 926. Unable to identify the specific manufacturer of her mother's drugs, the plaintiff joined as defendants 5 of the approximately 200 drug companies that were manufacturing DES during the relevant period. *Id.* at 929. The California Supreme Court overruled the manufacturers' preliminary objections and instructed the trial court to apply a

**(Footnote continued on next page…)**

18

*Sindell*, which may compel Pennsylvania courts "to depart from our time-tested general rule" of proximate causation. *Skipworth*, 690 A.2d at 172. However, the Court declined to do so, holding that application of market share liability to lead paint cases "would lead to a distortion of liability which would be so gross as to make determinations of culpability arbitrary and unfair." *Id.* The Court explained that, in order to apply market share liability, *all* of the makers of lead paint during the more than 100 years when it may have been used in the guardian's home would have to be held liable. *Id.* at 173. During that period, many manufacturers entered and left the lead paint market. *Id.* Furthermore, the Court noted that the offending drug in *Sindell* was a "fungible commodity," which all companies manufactured according to a single formula. *Id.* at 172. Lead paint, by contrast, had "different chemical formulations, contained different amounts of lead, and differed in potential toxicity." *Id.* at 173. Such complications, the Court held, were "fatal to [the] claim that application of market share liability to these defendants would be appropriate." *Id.*

In its appellate brief, the County argues that *Skipworth* is inapposite because its holding "was *specifically limited to products liability cases*." County's Br. at 24 (emphasis in original). According to the County, in *Skipworth*, the Supreme Court ruled out market share liability "in large part because it would be difficult to ascertain which lead paint manufacturers would have been responsible for the paint on the walls of that *one particular victim's house*." *Id.* at 23 (emphasis in original). That issue, the County argues, is irrelevant to a public nuisance claim, "which by its nature implicates" all of the Manufacturers in the manufacture, sale, distribution,

---

formula whereby "[e]ach defendant will be held liable for the proportion of the judgment represented by its share of that market unless it demonstrates that it could not have made the product which caused [the] plaintiff's injuries." *Id.* at 937.

19

and or promotion of lead paint across the County. *Id.* at 23-24. The usual standard of proximate causation, the County concludes, is therefore inapplicable.[9]

We disagree with the County that *Skipworth*'s holding was specifically limited to products liability cases. To the contrary, the Supreme Court clearly stated that it was considering whether Pennsylvania "should adopt the market share liability theory in the context of *lead poisoning* cases." 690 A.2d at 171 (emphasis added). After weighing and rejecting the plaintiffs' arguments, the Supreme Court concluded that the "[a]pplication of market share liability to *lead paint cases* such as this one would lead to a distortion of liability which would be so gross as to make determinations of culpability arbitrary and unfair." *Id.* at 172 (emphasis added).

The Supreme Court's rationale for rejecting market share liability further militates against distinguishing *Skipworth* from the instant matter. The inherent difficulties of apportioning liability, which the Court determined would prevent the fair application of market share liability in lead paint cases, are just as relevant in this case. For example, the *Skipworth* Court expressed skepticism that accurate market share estimates would ever be obtainable, "considering the lengthy relevant

---

[9] Although the County argues that proximate causation is not a necessary element of its claim, it fails to state which theory of liability it believes *should* be applied in this case. Given the County's extensive discussion of *Skipworth* and attempt to distinguish it, we surmise that it has market share liability in mind. We note, however, that the Supreme Court in *Skipworth* briefly discussed several other liability theories in relation to lead paint litigation and similarly rejected all of them. *See Skipworth*, 690 A.2d at 174 (explaining that "alternate liability" was inapplicable because the defendant manufacturers "did not act simultaneously in producing the lead paint"); *id.* (explaining that "conspiracy liability" was inapplicable because the plaintiffs failed to show that two or more defendants had "combined or agreed with intent to do an unlawful act or to do an otherwise lawful act by unlawful means"); *id.* at 174-75 (explaining that "concert of action" liability is inapplicable because the plaintiffs failed to "identify the wrongdoer or the person who acted in concert with the wrongdoer"). Since these liability theories appear to be inapplicable to this case for the same reasons as in *Skipworth*, we do not address them separately.

time period in question."[10] 690 A.2d at 173. Even if they were obtainable, the Court concluded, such estimates "would not serve to approximate [a] defendant's responsibility for injuries caused by its lead paint," given the varying levels of toxicity and bioavailability in different paint formulas, among other factors. *Id.* The "distortion of liability" that the Supreme Court anticipated would result does not depend on the specific legal theory being advanced by the plaintiff. As the Supreme Court observed, the essential purpose of market share liability is to ensure that "each manufacturer's liability would approximate its responsibility for the injuries caused by its own products." *Id.* Whether a plaintiff alleges negligence or a public nuisance, the same impediments to a reliably accurate calculation of liability prevent the market share liability theory from being fairly applied in the lead paint context.[11]

---

[10] We note that *Skipworth* involved a period nearly identical to the relevant period in this matter. The *Skipworth* plaintiffs "alleged that they had identified and joined in this action substantially all of the manufacturers of lead pigment used in residential house paint from 1870," when the guardian's house was built, "until production of lead pigment ceased in 1977." 690 A.2d at 171. Here, the County seeks damages for lead paint manufactured and sold in the County between 1880 and 1978.

[11] In its appellate brief, the County relies on this Court's recent decision in *Monsanto*, which, in the County's view, stands for the proposition that the public nuisance plaintiff "need not meet any of the elements of product liability law." County's Br. at 31. In *Monsanto*, the Commonwealth brought an action against a chemical corporation's successors for the release of polychlorinated biphenyls (PCBs) into public waterways, in violation of Section 3 of the Clean Streams Law, 35 P.S. § 691.3. The Commonwealth alleged, *inter alia*, that the release of PCBs constituted a public nuisance. 269 A.3d at 635. The defendants objected on the basis that the chemicals had been sold to third parties by the time of their discharge into the waterways, and that "Pennsylvania does not impose nuisance liability against a manufacturer after placing a product into the stream of commerce." *Id.* at 648. This Court overruled the objection, explaining: "the [Commonwealth] clearly declare[d] that [the d]efendants are responsible for PCBs entering the Commonwealth's waters because [the d]efendants knew that the uses for which they marketed, sold, and distributed PCB mixtures would result in leaching, leaking, and escaping their intended applications and contaminating (i.e., polluting) those waters." *Id.* at 653.

**(Footnote continued on next page…)**

The County maintains that "any continued reference to *Skipworth* and other products liability cases is simply a red herring," since its public nuisance action does not seek relief for private harms. County's Br. at 25. The Trial Court agreed, and explained that "*Skipworth* . . . was a [products liability] suit on behalf of one individual, so it would make sense to require proof of the manufacturer of the paint that injured that individual. By contrast, the [C]ounty here alleges widespread harm throughout the community." O.R., Item No. 100 n.1.

We disagree that such purported differences justify distinguishing this matter from *Skipworth*. As explained in the foregoing section, the harms alleged by the County, even if alleged to have occurred in large numbers, do not constitute the injury to communal interests required of a public nuisance claim. Since the County only alleges individual harms occurring on private property, as an alleged result of the use of the Manufacturers' products, we agree with the Manufacturers that the County's claim is essentially a products liability claim in the guise of a public nuisance action. For this additional reason, we conclude that *Skipworth*'s holding is properly applied to this matter.

### C. The County's Claims and the Declaratory Judgments Act

Finally, the Manufacturers argue that the County's request for declaratory relief in the Second Amended Complaint would effectively "rewrite the Certification Act and judicially impose a new policy decision that federal, state, and local authorities all reject." Manufacturers' Br. at 44. The Manufacturers argue that, far

---

We conclude that *Monsanto* is distinguishable from this case for two reasons. First, the defendants in *Monsanto* allegedly engaged in conduct that had been explicitly declared by a statute to be a public nuisance, which, this Court noted, would constitute a nuisance *per se*. *Id*. at 649. Second, the Commonwealth alleged harm to public waterways, which, as this Court concluded, constituted an "offense that annoys the community in general." *Id.* (citing *SPTR, Inc. v. City of Phila.*, 150 A.3d 160, 167 (Pa. Cmwlth. 2016)).

22

from "affording 'relief from uncertainty and insecurity,'" the relief sought would "not settle anything between the parties," because it would not identify which, or how many, properties are in need of abatement. *Id.* at 46-47 (citing 42 Pa. C.S. § 7541(a)). The Manufacturers also argue that the County failed to join "all persons . . . who have or claim any interest which would be affected by the declaration," as required by the DJA. *See* 42 Pa. C.S. § 7540(a).

While the DJA is broad in scope and is to be liberally construed, it is not without limits. *Ronald H. Clark, Inc. v. Twp. of Hamilton*, 562 A.2d 965, 967 (Pa. Cmwlth. 1989). For example, declaratory judgment proceedings cannot be used to make new law, but only to declare the state of the existing law on a particular issue. *P.J.S. v. Pa. State Ethics Comm'n*, 669 A.2d 1105, 1109 (Pa. Cmwlth. 1996); *see also Doe v. Johns-Manville Corp.*, 471 A.2d 1252, 1254 (Pa. Super. 1984) (explaining that declaratory judgments "may not be used to search out new legal doctrines"). The purpose of the DJA is "to settle and to afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations." 42 Pa. C.S. § 7541(a). Thus, courts generally should refuse to grant declaratory relief where it would not resolve the controversy or uncertainty that spurred the request. *Rendell v. Pa. State Ethics Comm'n*, 938 A.2d 554, 559 (Pa. Cmwlth. 2007). Furthermore, all persons who have an interest in the declaration must be made parties to the action. *HYK Constr. Co. v. Smithfield Twp.*, 8 A.3d 1009, 1015 (Pa. Cmwlth. 2010); 42 Pa. C.S. § 7540(a).

In this case, the County seeks a declaration that the Certification Act declares lead paint itself to be a public nuisance and that the Manufacturers are liable for damages, even though the County admittedly does not show proximate cause. As explained above, however, the County's proposed interpretation of the Certification

23

Act is contrary to its plain meaning and legislative intent. Consequently, the relief requested, if granted, would be tantamount to creating new law in contravention of the DJA. Additionally, because the County has never identified which of the 211,402 possibly affected structures are in need of abatement, or which Manufacturer's products are found in each structure, the requested relief, if granted, would likely create far more legal uncertainties than it would settle.

Lastly, the County has not joined the owners of any of the potentially affected properties, or any County property owners at all. The owners of those properties would obviously have an interest in the declaration; thus, their joinder was mandatory for this action to proceed pursuant to the DJA. *See HYK*, 8 A.3d at 1015. For these reasons, we conclude that the County is not entitled to declaratory relief.

## IV. Conclusion

In sum, we conclude that the County failed to identify a statutory basis for its public nuisance action and failed to allege that the Manufacturers proximately caused its alleged injuries under Pennsylvania tort law. Therefore, the Second Amended Complaint fails to state a claim for which relief can be granted. Furthermore, the County's request for declaratory relief is contrary to the scope, stated purpose, and requirements of the DJA. Accordingly, we reverse the Trial Court's Order and remand to the Trial Court for the entry of an order dismissing the Second Amended Complaint.

_____
ELLEN CEISLER, Judge

24

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Atlantic Richfield Company, E.I. du : 
Pont de Nemours and Company, NL : 
Industries, Inc., PPG Industries, Inc., : 
and The Sherwin-Williams Company, : 
             Appellants : 
                   : 
        v. :      No. 1338 C.D. 2021
                   : 
The County of Montgomery, : 
Pennsylvania : 

# **O R D E R**

AND NOW, this 5th day of May, 2023, the Order of the Court of Common Pleas of Montgomery County (Trial Court) in the above-captioned matter, dated October 15, 2021, is hereby REVERSED. This matter is hereby REMANDED to the Trial Court for the entry of an order dismissing the County of Montgomery, Pennsylvania's Second Amended Complaint.

Jurisdiction relinquished.

                                _____
                                ELLEN CEISLER, Judge